[Sac. No. 7869. In Bank. Sept. 13, 1971.]

METHODIST HOSPITAL OF SACRAMENTO et al., Petitioners, v. LOUIS F. SAYLOR, as Director, etc., Respondent.

## COUNSEL

Musick, Peeler & Garrett, Charles F. Forbes, Robert D. Girard, Bruce E. Clark, John R. Browning and Hermann E. Lorenz, Jr., for Petitioners.

Thomas C. Lynch and Evelle J. Younger, Attorneys General, and Walter J. Wiesner, Deputy Attorney General, for Respondent.

George Herrington and Orrick, Herrington, Rowley & Sutcliffe as Amici Curiae on behalf of Respondent.

## OPINION

**MOSK, J.** — This proceeding for writ of mandate is brought to test the constitutionality of the 1969 Health Facility Construction Loan Insurance Law. (Health & Saf. Code, ch. 4, pt. 1, div. 1.) As will appear, we conclude the law is constitutional and therefore the writ should issue.

Since 1879, article XVI, section 1, of the California Constitution has prohibited the Legislature from creating any "debt" or "liability" of the state in excess of $300,000 except by means of a bond law specifying the use of the funds passed by two-thirds of each house and approved by a majority of the voters.

At the November 1968 general election, however, the voters amended

the Constitution by adding thereto section 21.5 of article XIII. Section 21.5 declares that "The Legislature shall have the power to insure or guarantee loans made by private or public lenders to nonprofit corporations and public agencies, the proceeds of which are to be used for the construction, expansion, enlargement, improvement, renovation or repair of any public or nonprofit hospital, hospital facility, or extended care facility, facility for the treatment of mental illness, or all of them, including any outpatient facility and any other facility useful and convenient in the operation of the hospital and any original equipment for any such hospital or facility, or both."

The section further declares that "No provision of this Constitution, including but not limited to, Section 1 of Article XVI [i.e., the above-mentioned limitation on state debt] and Section 18 of Article XI [i.e., the similar limitation on municipal debt, now found in § 40 of art. XIII], shall be construed as a limitation upon the authority granted to the Legislature by this section."

In its next session the Legislature enacted and the Governor signed the Health Facility Construction Loan Insurance Law (hereinafter called Loan Insurance Law), an elaborate statutory scheme designed to implement this constitutional provision. (Stats. 1969, ch. 970, now Health & Saf. Code, ch. 4, pt. 1, div. 1.) Health and Safety Code section 436.1[1] recites the legislative intent: "The purpose of this chapter is to provide, without cost to the state, an insurance program for health facility construction loans in order to stimulate the flow of private capital into health facilities construction and in order to rationally meet the need for new, expanded and modernized public and nonprofit health facilities necessary to protect the health of all the people of this state. The provisions of this chapter are to be liberally construed to achieve this purpose." The scope of the statute is commensurate with the above-quoted language of the constitutional amendment.[2]

The program is administered by the State Department of Public Health (hereinafter called the Department), which is directed to make all necessary

---

[1]All statutory references in the following analysis are to the Health and Safety Code.

[2]Thus subdivision (c) of section 436.2 defines "construction" within the meaning of the chapter to include both the building of new structures and the expansion or renovation of old, together with all expenses incidental to constructing and equipping such buildings. Subdivision (h) then defines "health facility" as "any facility providing or designed to provide services for the acute, convalescent, and chronically ill and impaired, including but not limited to public health centers, community mental health centers, facilities for the mentally retarded, and general, tuberculosis, mental, and other types of hospitals and related facilities, such as laboratories, outpatient departments, extended care, nurses' home and training facilities, offices and central service facilities" operated in connection with the foregoing establishments.

rules and regulations to implement its provisions (§§ 436.3, 436.5) "so that, in conjunction with all other existing facilities, the necessary physical facilities for furnishing adequate health facility services will be available to all the people of the state" (§ 436.4). In particular, the Department is mandated to inventory all existing health facilities, survey the need for additional such establishments, and develop a "state plan" for the construction of health facilities "on the basis of the relative need of different sections of the population and of different areas" (*ibid.*; see also § 432 et seq.). The Department shall furnish insurance on loans for health facility construction only "when need is clearly demonstrated, in the order of relative need so determined" (§ 436.4), but no such insurance shall be provided until the loan "has been finally approved through the statewide system of health facility planning" (§ 436.45).

Strict requirements must be met before a loan will be eligible for insurance. Inter alia, the loan must be secured by an approved mortgage and covered by title insurance with the Department as beneficiary, contain complete amortization provisions requiring periodic repayment, have a maturity date not to exceed 30 years, and be in an amount of not more than 90 percent of the construction cost. (§ 436.8.)[3] Formal procedures are set up for applications, hearings, and decisions on requests for such loans. (§§ 436.9-436.12.)

The statute further creates in the State Treasury a Health Facility Construction Loan Insurance Fund (hereinafter called Loan Insurance Fund), to be used by the Department as a revolving fund for carrying out the provisions of the program. (§ 436.26.) The Legislature may appropriate monies to this fund;[4] and into the fund will be deposited, inter alia, an annual premium charge levied on all borrowers (§ 436.7; see also fn. 9, *post*). If a borrower becomes delinquent in paying the premium charge, the insurance will automatically terminate. (§ 436.23.)

If a borrower defaults on repayment of a loan insured under the program, a number of remedies are provided. After the Department "determines that the lender and borrower have exhausted all reasonable means of curing [the] default," it may, "when such is in the best interests of the state," cure the default itself by paying the amount in arrears in cash to the lender, using for this purpose money from the Loan Insurance Fund; the lender's security will be *pro tanto* assigned to the Department, and the

---

[3] If the borrower is a political subdivision, the funds expended may take the form of a local bond issue and the loan may cover the entire construction cost.

[4] The 1969 legislation (Stats. 1969, ch. 970, § 3) appropriated $94,754 from the state's general fund to the Loan Insurance Fund for use in administering the program during the first year of its operation, i.e., fiscal 1969-1970.

borrower will become liable for repayment of the amount directly to the Department. (§ 436.17.) Secondly, to avoid foreclosure the Department may, by assignment, "acquire the loan" and appurtenant security agreements, thus allowing the borrower to continue to operate the property; in such cases, the lender will be reimbursed by the issuance of "debentures" in the amount of the unpaid balance of the loan plus interests and costs. (§ 436.16.) Thirdly, in cases in which the lender does foreclose the mortgage and takes possession of the property, he may then convey the property to the Department,[5] assign his claim to the Department, and receive in exchange the same debentures in the amout of the outstanding value of the loan. (§ 436.13.) The Department may either operate or sell any property received by such conveyance, and all income or proceeds therefrom will be added to the Loan Insurance Fund. (§ 436.21.) In addition, the Department may "pursue to final collection" all claims against borrowers assigned to it under the program. (*Ibid.*)

Any debentures issued for the foregoing purposes will be in multiples of $1,000, executed in the name of the Loan Insurance Fund as obligor, signed by the State Treasurer, negotiable, interest-bearing, tax exempt, and maturing at the same date as the loan they replace. (§§ 436.19, 436.20.) The statute further provides that such debentures "shall be, pursuant to Article XIII, Section 21.5 of the California Constitution, fully and unconditionally guaranteed as to principal and interest by the State of California. . . ." When due, their principal or interest will be paid out of the Loan Insurance Fund, "which shall be primarily liable therefor." In the event the Loan Insurance Fund is unable to pay such principal or interest, "the State Treasurer shall pay to the holders the amount thereof which is authorized to be appropriated, out of any money in the Treasury not otherwise appropriated. . . ." To the extent of any amount thus paid the State Treasurer will succeed to the rights of the debenture holders, and the Loan Insurance Fund will be liable to repay that amount to the Treasury. (§ 436.20.)

Finally, the Department's authorization to insure health facility construction loans is limited to a total of $750 million spread over the first five years of the program. The ceiling will expire on July 1, 1974, but the Department is directed to report to the Legislature on the operation and fiscal condition of the program at the beginning of the 1974 session. (§ 436.28.)

The present petitioners are two nonprofit California hospitals. They applied in writing for state insurance on private construction loans to

---

[5]In the alternative, to avoid unnecessary conveyance expenses the Department may take title directly from the defaulting borrower. (§ 436.15.)

finance the building of certain approved health facilities. The Director of the Department of Public Health declined to entertain the applications on the ground that independent bond counsel had raised "substantial questions" as to the power of the Legislature to authorize the issuance of debentures under this program. Petitioners then filed this proceeding for writ of mandate to compel respondent director to adopt the necessary rules and regulations and to entertain their applications. The case is before us on an alternative writ issued by the Court of Appeal.

We are guided in our inquiry by well settled rules of constitutional construction. ■ Unlike the federal Constitution, which is a grant of power to Congress, the California Constitution is a limitation or restriction on the powers of the Legislature. (*Los Angeles Met. Transit Authority* v. *Public Util. Com.* (1963) 59 Cal.2d 863, 868 [31 Cal.Rptr. 463, 382 P.2d 583]; *People* v. *Coleman* (1854) 4 Cal. 46, 49, overruled on other grounds in *People* v. *McCreery* (1868) 34 Cal. 432, 458.) Two important consequences flow from this fact. ■ First, the entire law-making authority of the state, except the people's right of initiative and referendum, is vested in the Legislature, and that body may exercise any and all legislative powers which are not expressly or by necessary implication denied to it by the Constitution. (*Dean* v. *Kuchel* (1951) 37 Cal.2d 97, 104 [230 P.2d 811]; *People* v. *Judge of the Twelfth District* (1861) 17 Cal. 547, 552.) In other words, "we do not look to the Constitution to determine whether the legislature is authorized to do an act, but only to see if it is prohibited." (*Fitts* v. *Superior Court* (1936) 6 Cal.2d 230, 234 [57 P.2d 510].)

Secondly, all intendments favor the exercise of the Legislature's plenary authority: "If there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action. ■ Such restrictions and limitations [imposed by the Constitution] are to be construed strictly, and are not to be extended to include matters not covered by the language used." (*Collins* v. *Riley* (1944) 24 Cal.2d 912, 916 [152 P.2d 169]; accord, *Dean* v. *Kuchel* (1951) *supra*, 37 Cal.2d 97, 100, and cases cited.) ■ Conversely, a constitutional amendment removing those restrictions and limitations should, in cases of doubt, be construed liberally "in favor of the Legislature's action."

■ Applying these principles, we see that in adopting article XVI, section 1, of the Constitution in 1879 the people placed general restrictions on the power of the Legislature to create debts and liabilities against the credit of the state, while in adopting article XIII, section 21.5, in 1968 the people removed those restrictions *pro tanto,* i.e., insofar as necessary to permit enactment of the program of health facility construction loan insur-

ance envisaged by the amendment.[6] Section 21.5 expressly lifted the bar of *any* other provision of the Constitution, "including but not limited to, Section 1 of Article XVI. . . ." It thereby restored to the Legislature its plenary power to fashion such a loan insurance program in whatever manner would best serve the needs of the people, and in particular to prescribe the various methods by which the state might discharge its ultimate obligation as insurer under that program.

Respondent and amicus curiae, however, have raised a doubt as to whether the people's restoration of legislative power to "insure or guarantee" such loans extends to one of the methods actually adopted, i.e., the issuance of debentures in the amount of the unpaid balance upon default. It is contended that section 21.5 does not expressly authorize the use of such debentures, and the "insure or guarantee" language of the section should not be construed to do so: while conceding "it is possible for insurance to be effected via debentures, as in the Loan Insurance Law," amicus asserts "that is not the normal or ordinary means of carrying out an insurance plan."[7]

■ This approach overlooks still another settled principle of construction, i.e., the strong presumption in favor of the Legislature's interpretation of a provision of the Constitution. That presumption has been phrased differently over the years, but its import remains clear. Thus in *San Francisco* v. *Industrial Acc. Com.* (1920) 183 Cal. 273, 279 [191 P. 26], the court held that "where a constitutional provision may well have either of two meanings, it is a fundamental rule of constitutional construction that, if the Legislature has by statute adopted one, its action in this respect is well nigh, if not completely, controlling. When the Legislature has once construed the constitution, for the courts then to place a different construction upon it means that they must declare void the action of the Legislature. It is no small matter for one branch of the government to annul the formal exercise by another and coordinate branch of power committed to the latter, and the courts should not and must not annul, as contrary to the constitution, a statute passed by the Legislature, unless it can be said of the statute that it positively and certainly is opposed to the constitution. This is elementary.

[6]It is true that section 21.5 speaks in terms of a *grant* of such power to the Legislature; but that choice of words, while perhaps more easily understood by the electorate called upon to vote on the amendment, was not intended to overturn the foregoing century-old understanding of the nature of our Constitution as a limit on legislative action rather than its source.

[7]Amicus also undertakes to explain the portion of section 21.5 which lifts the ban on state indebtedness, by asserting that without that language even a "normal" method of governmental insurance of private loans would have created an impermissible "liability" of the state within the meaning of article XVI, section 1.

But plainly this cannot be said of a statute which merely adopts one of two reasonable and possible constructions of the constitution."

In *Pacific Indemnity Co.* v. *Indus. Acc. Com.* (1932) 215 Cal. 461, 464 [11 P.2d 1, 82 A.L.R. 1170], the same reasoning led us to the statement that "For the purpose of determining constitutionality, we cannot construe a section of the Constitution as if it were a statute, and adopt our own interpretation without regard to the legislative construction. Where more than one reasonable meaning exists, it is our duty to accept that chosen by the legislature." (Accord, *Lundberg* v. *County of Alameda* (1956) 46 Cal.2d 644, 652 [298 P.2d 1].) Again, in *Delaney* v. *Lowery* (1944) 25 Cal.2d 561, 569 [154 P.2d 674], we referred to the presumption of constitutionality and the rule of strict construction of constitutional limitations on the Legislature, and concluded, "Those principles indicate the latitude and effect to be given a legislative construction or interpretation of the Constitution. When the Constitution has a doubtful or obscure meaning or is capable of various interpretations, the construction placed thereon by the Legislature is of very persuasive significance." The rule, moreover, remains viable today. (See, e.g., *County of Madera* v. *Gendron* (1963) 59 Cal.2d 798, 802 [31 Cal.Rptr. 302, 382 P.2d 342, 6 A.L.R.3d 555]; *Miro* v. *Superior Court* (1970) 5 Cal.App.3d 87, 99 [84 Cal.Rptr. 874]; *Dept. of Alcoholic Bev. Control* v. *Superior Court* (1968) 268 Cal. App.2d 67, 74 [73 Cal.Rptr. 780].)

In the case at bar it cannot be doubted that the terms "insure or guarantee" in section 21.5 are "capable of various interpretations," and we need not cite dictionary or thesaurus to establish the fact of their many meanings. Nor need it be shown that the construction placed upon the constitutional provision by the Legislature is "more probably than not" the meaning intended by those who framed or adopted the proposal. Thus in *San Francisco* v. *Industrial Acc. Com.* (1920) *supra,* 183 Cal. 273, a workmen's compensation statute allowing recovery for work-connected "disease" as well as trauma was attacked on the ground the enabling provision of the Constitution authorized the Legislature to prescribe such benefits for "injury" only. This court reviewed a number of decisions from other jurisdictions construing the word "injury" to include "disease," and concluded (at pp. 281-282): "The constitution cannot be given the more limited meaning contended for by the city without declaring this provision in the statute void. This we cannot do, unless there is a plain and unmistakable conflict between the statute and the constitution. But there is no such plain and unmistakable conflict, since the statute does no more than adopt what is at least a possible and not unreasonable construction of the constitution." Again, in *Delaney* v. *Lowery* (1944) *supra,* 25 Cal.2d 561, 569, 570, we upheld a legislative construction of a constitutional provision

on the ground it was "not unreasonable or arbitrary" and we could not say the Legislature "may not reasonably declare" the meaning it gave to the Constitution.

■ Here the definition of "insure or guarantee" adopted by the Legislature is "at least a possible and not unreasonable" construction of the Constitution. To establish this point it will be instructive, as often is true, to examine the prior state of the law, the evil intended to be corrected, and the legislative history of the proposed remedy. (*Arnold* v. *Hopkins* (1928) 203 Cal. 553, 558 [265 P. 223].)

In 1946 Congress enacted the Hospital Survey and Construction Act (60 Stat. 1040), providing that if a state sets up a specified machinery for surveying its hospital needs and for developing a plan for hospital construction, the federal government will pay one-third of the cost of projects approved under that plan.

Our Legislature promptly complied, adopting at its next session the California Hospital Survey and Construction Act. (Stats. 1947, ch. 327, now Health & Saf. Code, ch. 3, pt. 1, div. 1.) The statute specifically declared it was designed to "comply with and implement" the federal act, and accordingly prescribed detailed provisions for surveying and planning California's hospital construction needs. The Legislature further proposed, and the people adopted in 1952, a constitutional amendment permitting state funds to be used to build public or nonprofit private hospitals in conjunction with funds made available under the federal act. (Cal. Const., former art. IV, § 22, now art. XIII, § 21.)

In the ensuing years, however, budgetary considerations restricted the availability of state money for this purpose, and the program was unable to keep up with California's fast-growing need for additional hospital facilities. Alternative solutions were therefore sought. Among the possibilities was that of enacting in California a program of governmental insurance on hospital construction loans from private sources, by analogy to the federal mortgage insurance system which has operated in various forms for many years. (See generally 12 U.S.C., ch. 13, subch. II.) In February 1968 the Attorney General was asked whether such a program would be lawful under then-existing California constitutional provisions; he replied that the authorization to use state money for hospital construction (art. XIII, § 21) does not include the extending of state credit by means of a loan insurance program of this type, and that such an extension of credit would be barred by the general ban on state indebtedness (art. XVI, § 1).

To overcome this constitutional barrier the Legislature at its 1968

session passed a proposed constitutional amendment which the people adopted at the following general election as new section 21.5 of article XIII. Simultaneously with the introduction of that amendment its author also presented legislation creating a state construction loan insurance program based on the above-mentioned federal system, to take effect if and when the amendment was adopted. The bill did not become law in that session, but was reintroduced with additional sponsors early in 1969 (Sen. Bill 334). On the point now concerning us, the Legislative Counsel gave his opinion that if Senate Bill 334, as amended, were to be enacted, its provisions for the issuance of debentures upon default of a borrower would be exempted by section 21.5 from the general ban on state indebtedness. The Legislature thereafter adopted Senate Bill 334 as the Health Facility Construction Loan Insurance Law of 1969.

In these circumstances we cannot say the Legislature's construction of section 21.5 was "unreasonable or arbitrary." The electorate was apprised of the general purpose of the proposed addition of section 21.5 to the Constitution, and knew it would permit enactment of a mortgage insurance plan backed by the credit of the state.[8] The plan immediately adopted by the Legislature is modeled closely on the federal mortgage insurance programs. In those programs, as in ours, the government is empowered to insure loans for approved construction projects, to collect premiums for deposit in a special fund, and in case of default to take title to the property and pay off the lender by the issuance of interest-bearing, negotiable debentures; the fund is primarily liable for payment of the interest and principal on such debentures, but failing that they are to be paid "out of any money in the Treasury not otherwise appropriated." (See generally 12 U.S.C. §§ 1709-1710.) Indeed, many of the key provisions of our law (e.g., Health & Saf. Code, §§ 436.13, 436.19, 436.20) are taken almost verbatim from the corresponding federal statutes.

This is not to say, of course, that our legislation is constitutional simply because it uses certain language also employed by Congress; nor are we unmindful of the fact that the United States Constitution, in contrast to

---

[8]The argument in favor of the 1968 amendment printed in the ballot pamphlet reminded the voters of the existing program of federal-state cooperation on hospital construction, the 1952 constitutional amendment permitting direct state aid, and the failure of that program to meet current needs; a vote for the proposed amendment, it was explained, would "authorize a constructive alternate State-supported mortgage insurance plan to match Federal funds." It is true the proponents optimistically added that "Loan fees would provide administrative costs and reserves for possible default, making the use of tax money unnecessary"; but the opposing ballot argument specifically warned the voters that the proposal "will extend the credit of the State of California" and that in no similar instance has the state ever "loaned its credit" for this purpose.

ours, does not contain a general ban on governmental indebtedness. But there can be no doubt, at least, that the federal acts "insure or guarantee" the loans with which they deal. Accordingly, our Legislature could reasonably consider the federal experience in giving a similar meaning to these words as they appear in section 21.5. Once this is understood, it will be seen that respondent has no cause to fear the Loan Insurance Law will run afoul of article XVI, section 1, of our Constitution.

▮▮ Finally, amicus curiae advances the additional argument that the Legislature's reading of section 21.5 is foreclosed by a subsequent provision—section 2, subdivision (a)—of article XVI. That section, adopted in 1962, declares in part that "No amendment to this Constitution which provides for the preparation, issuance and sale of bonds of the State of California shall hereafter be submitted to the electors, nor shall any such amendment to the Constitution hereafter submitted to or approved by the electors become effective for any purpose."

The point is not well taken. Section 2 of article XVI was designed to put an end to the former practice of enshrining ordinary bond laws in the Constitution, where they inevitably became obsolete: subdivisions (b) and (c) of section 2 repealed all such laws then existing and recodified them as statutes, and subdivision (a) further declared that future measures of this kind must be submitted to the electorate as bond acts, not constitutional amendments. But the Loan Insurance Law now before us is not an ordinary bond act. As we explained at the outset, the issuance of debentures is but one of a number of alternative methods provided in the statute by which the state may choose to discharge its ultimate obligation as insurer under this program. The maturing of that obligation, moreover, is subject to two contingencies not present in the case of an ordinary bond law. First, debentures will not be issued under this program unless and until a borrower defaults. But this is a contingency the occurrence or nonoccurrence of which remains totally beyond the state's control; it is therefore fundamentally different from the decision, vested in the state, as to whether to put on the market an ordinary bond issue approved by the electorate. Secondly, even after debentures are issued to cover a defaulted loan, the obligor remains the Loan Insurance Fund and the State Treasury will not be liable for payment of principal or interest when they fall due unless at that moment the fund is devoid of uncommitted monies sufficient to discharge the obligation.[9] By contrast, of course, the State Treasury

---

[9] It bears remembering that the Loan Insurance Fund will contain (1) capital appropriated to it by the Legislature, (2) premium income from all outstanding loans, (3) proceeds from the sale of property conveyed to the Department after default and foreclosure, (4) rental and other income from the operation of such property by the Department if it is not sold, and (5) administration income such as fees

is unconditionally liable for such payments in the case of an ordinary bond issue.

For the foregoing reasons we conclude that the Health Facility Construction Loan Insurance Law is not open to the constitutional objections here raised, and that respondent director must therefore discharge the duties enjoined upon him by that law.

Let a peremptory writ of mandate issue as prayed.

Wright, C. J., McComb, J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

---

charged for processing loan applications (§ 436.9) and for inspection and certification of the progress of an insured construction project (§ 436.6). If there is little money in the fund at the present time, as amicus curiae emphasizes, it is obviously because none of the foregoing sources except capital appropriations can produce any income whatever until the program is allowed to begin its operations.