[No. AO22625. First Dist., Div. Four. Mar. 9, 1984.]

ROBERTA L. SCHODERBEK et al., Plaintiffs and Appellants, v.
ALFRED E. CARLSON, as Assessor, etc., et al.,
Defendants and Respondents.

COUNSEL

Thomas G. Beatty for Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, Timothy G. Laddish, Deputy Attorney General, Donald L. Clark, County Counsel, Thomas William Cain, Deputy County Counsel, and Byron D. Athan for Defendants and Respondents.

---

## OPINION

**PANELLI, J.**—Fifteen plaintiffs, on behalf of themselves and a class which they represent, but which is not yet certified, appeal from the dismissal of their complaint following the granting of respondents' motion for summary judgment. These same parties were previously before this court and sought a resolution of the same issues which are presented here. At that time this court determined that the appellants lacked standing to maintain an action where they had failed to exhaust all their possible administrative remedies. (*Schoderbek* v. *Carlson* (1980) 113 Cal.App.3d 1029 [170 Cal.Rptr. 400], (*Schoderbek I*).) At that time it was clearly indicated that the merits of appellants' contentions were not being considered.

After exhaustion of administrative remedies in the manner suggested by this court in *Schoderbek I,* appellants, in February 1982, filed a new complaint seeking declaratory relief, a writ of mandate, injunctive relief, and damages. Appellants filed a motion for summary judgment in January 1983 and respondents filed a similar cross-motion in March 1983. On April 25, 1983, the court denied appellants' motion, granted summary judgment to respondents, and ordered appellants' complaint dismissed. Appellants filed a timely notice of appeal and appear before us again for a determination on the merits. We find that appellants' claims have no merit and affirm the trial court's judgment of dismissal.

The facts, as set forth in the *Schoderbek I* opinion are restated herein verbatim: "Fifteen named plaintiffs in their own behalf and on behalf of persons similarly situated brought a class action for declaratory relief, writ of mandate, preliminary and permanent injunction and damages, naming the Assessor of Santa Clara County, Alfred Carlson, the former Assessor of Santa Clara County, the Director of Finance of Santa Clara County, the Tax Collector of Santa Clara County, the Board of Supervisors of Santa Clara County, the State of California and the State Board of Equalization as defendants.[1] Proposition 13 (art. XIII A of the Cal. Const.), an initiative

---

"[1]Plaintiffs seek to represent all members of the class who are owners of real property in Santa Clara County that has been purchased, undergone a change of ownership or been newly constructed subsequent to February 28, 1975 and who have had their real property assessed for the 1978-1979 tax year by a method which is in contravention of article XIII A of the California Constitution (Proposition 13), sections 110 and 110.1 of the Revenue and Taxation Code and rule 460 adopted by the State Board of Equalization (Cal. Admin. Code, tit. 18, § 460.)"

measure adopted by the People of the State of California in June of 1978, significantly altered the system of real property taxation in this state. Plaintiffs in this case are challenging certain property tax assessment practices in Santa Clara County which began after the passage of Proposition 13.

" . . . . . . . . . . . . . . . . . . . .

"Prior to Proposition 13, real property was appraised for taxation purposes every year at its 'fair market value' or 'full cash value' on the lien date (March 1). (Rev. & Tax. Code, §§ 110, 401.3, 405, 405.5, 2192.) The tax rate was determined by the various local entities. Proposition 13 changed this approach in several major respects. First, the tax rate was limited to 1 percent of the 'full cash value' of the property. (Cal. Const., art. XIII A, § 1.) Second, and relevant to this case, the determination of 'full cash value' is no longer to be made yearly as of the 'lien date.' Subdivision (a) of section 2 of article XIII A of the California Constitution covers the subject of when 'full cash value' is determined and provides: 'The *full cash value means* the county assessor's valuation of real property as shown on the 1975-76 tax bill under "full cash value" or, *thereafter, the appraised value of real property when purchased, newly constructed, or a change in ownership has occurred after the 1975 assessment.* All real property not already assessed up to the 1975-76 full cash value may be reassessed to reflect that valuation. For purposes of this section, the term "newly constructed" shall not include real property which is reconstructed after a disaster, as declared by the Governor, where the fair market value of such real property, as reconstructed, is comparable to its fair market value prior to the disaster.' (Italics added.) This appeal concerns the proper interpretation to be given the underscored portion of subdivision (a) of section [2] of article XIII A.

"In order to illustrate plaintiffs' contentions in the instant case, it is helpful to set out the history of assessments on one piece of real property owned by a named plaintiff, Jackson Huang. Jackson Huang and his wife Alice Huang purchased their home at 25111 La Loma Drive, Los Altos, California, on December 28, 1976 for $190,000. In March of 1976, the property was valued on the property tax rolls at $135,000. In March of 1977, the property was valued on the property tax rolls at $165,000. In March of 1978, the property was valued on the property tax rolls at $201,300. After the passage of Proposition 13, the Huang property was reappraised and valued at $199,300.

"Plaintiffs contend that the 'appraised value' for the Huang property is (1) the 'full cash value' that appears on the tax rolls for the lien date *preceding* the purchase ($135,000); or (2) the 'full cash value' that appears on

the tax rolls for the lien date *succeeding* the purchase ($165,000); or (3) a 'ratioed' figure, depending on when the purchase took place, of the 'full cash value' figures appearing on the tax rolls for the lien dates preceding and succeeding the purchase.[2]" (*Schoderbek I, supra,* 113 Cal.App.3d at pp. 1030-1032.)

## Discussion

■ I. As hereinbefore stated, appellants' complaint sought declaratory relief, a writ of mandate and injunctive relief. Respondents correctly argue that this requested relief is unavailable to appellants. *Schoderbek I* states "Plaintiffs also sought an injunction and a writ of mandate. Neither of these remedies is available when a taxpayer has an adequate remedy at law—a claim for refund followed by a suit for refund. [Citations.]" (*Id.,* 113 Cal.App.3d at p. 1037.) The court further stated in footnote 7, "It should be noted that plaintiffs sought an injunction 'enjoining the defendants from further assessing and collecting property taxes' in what they contend is an erroneous manner. Revenue and Taxation Code section 4807 precludes such relief. Section 4807 provides: 'No injunction or writ of mandate or other legal or equitable process shall issue in any suit, action, or proceeding in any court against any county, municipality, or district, or any officer thereof, to prevent or enjoin the collection of property taxes sought to be collected.'" (113 Cal.App.3d at p. 1037, fn. 7.) Accordingly, we find that appellants are not entitled to relief by either injunction or mandate.

*Schoderbek I, supra,* pages 1037-1038, points out that the vehicle for possible relief by appellants after an exhaustion of administrative remedies would be a suit for refund of taxes paid. While appellants' complaint does not specifically seek a refund for overpaid taxes it does include a prayer for damages. Therefore, as suggested by respondents, we will treat the prayer for damages in the complaint as a claim for refund. Having thus resolved the procedural obstacles to a resolution of this dispute, we deal with the merits of appellants' claims.

■ II. In the instant case the parties had entered into a stipulation as to the facts and issues to be determined. The stipulation resolved all factual disputes and hence the decision is to be made solely as a question of law. As a result the issue was properly resolved in the trial court by means of a motion for summary judgment. (Code Civ. Proc., § 437c.)

The *parties agreed that under the terms of article XIII A, section 2, sub-division (a) of the California Constitution,* "the appraised value of real

---

"[2]Under this last theory, the appraised value for the Huang property would be $135,000 plus $^{10}/_{12}$ of the difference between the preceding and subsequent lien date figures."

property when purchased, newly constructed, or a change of ownership has occurred"[1] is to be determined using the "full cash value" standard set by Revenue and Taxation Code section 110. For property which has been purchased, newly constructed or has undergone a change of ownership after March 1, 1975, the parties have framed four different alternatives to determine "full cash value."

 Appellants suggest three alternative methods to determine "full cash value." They are (1) by using the "full cash value" of such property as found on the assessment roll for the lien date *preceding* said purchase. This method would apply to property purchased, up to, but not including March 1, 1979; (2) by using the "full cash value" of such real property as found on the assessment roll for the lien date *following* said purchase. This method would not apply to property purchased on or after March 1, 1978; or (3) by using a date of purchase *apportionment* between (a) the "full cash value" of such real property as found on the assessment roll for the lien date preceding the purchase, and (b) the "full cash value" of such real property as found on the assessment roll for the lien date following the purchase. This method would not apply to property purchased on or after March 1, 1978.

Respondents on the other hand, contend that "full cash value" is determined through a separate appraisal of the "full cash value" of the property as of the actual date that the property was purchased. This is the statutory interpretation which is followed by respondents.

The trial court denied appellants their requested relief, thereby agreeing with the respondents' interpretation of "full cash value." The question on appeal, then, is whether the trial court correctly interpreted the relevant portions of article XIII A of the California Constitution. We determine that it did and affirm the judgment.

"Proposition 13—The Jarvis-Gann Amendment" became article XIII A of the California Constitution when approved by a vote of the People on June 6, 1978. Article XIII A, section 1, subdivision (a), provides "[t]he maximum amount of any ad valorem tax on real property shall not exceed One percent (1%) of the full cash value of such property." Section 2, subdivision (a) of the same article defines the term "full cash value" as follows: "The full cash value means the county assessor's valuation of real property as shown on the 1975-76 tax bill under 'full cash value,' or thereafter, *the*

---

[1]Hereafter the phrase "when purchased, newly constructed or a change in ownership has occurred" will not be repeated verbatim. Instead the court will use the term "when purchased" to refer to all events which trigger a new appraisal. Our conclusions, therefore, apply as well to property which is newly constructed or has changed ownership.

*appraised value of real property when purchased,* newly constructed or a change in ownership has occurred after the 1975 assessment. All real property not already assessed up to the 1975-76 full cash value may be reassessed to reflect that valuation." (Italics added.)

The three alternatives suggested by appellants to determine "the appraised value of real property when purchased" all relate to existing lien date values as shown on the county assessor's tax rolls. In so doing, appellants' construction implicitly requires us to find that the meaning of the terms "valuation of real property as shown on the . . . tax bill" and "appraised value of real property when purchased," as used in section 2, subdivision (a), of article XIII A, are synonymous. This is so since each of the terms would be referring to an existent value recorded on the tax rolls of the county assessor. We believe that if such interpretation was intended, the drafters of this initiative would have made both terms referrable to the tax bill or tax rolls. We believe that since both terms were used, it is not logical or reasonable to attribute the same meaning to them.

Respondents' interpretation of the phrase "appraised value when purchased," on the other hand, gives the words their plain meaning, i.e., an evaluation (appraisal) is made of the property purchased, as of the date of purchase. Lien date values, therefore, would be irrelevant to the value of the property as of the date of purchase. We believe this interpretation is more reasonable and correct.

In our view article XIII A created two classifications of property taxpayers, namely those who owned property as of March 1, 1975, and those who purchased property after said date. Appellants' interpretation would create a further subclass, i.e., those acquiring property between March 1, 1975 and February 28, 1979, and those acquiring property after March 1, 1979. The former category would use the lien date values shown on the tax rolls as "the appraised value of real property when purchased," while the latter category would have their real property appraised at time of purchase. With respect to this latter category, i.e., those purchasing real property after March 1, 1979, appellants would adopt respondents' interpretation of section 2, subdivision (a). We find nothing in article XIII A or the legislation passed to implement Proposition 13 to indicate that such an additional classification was intended.

More importantly, however, following the passage of Proposition 13, the State Legislature enacted Revenue and Taxation Code section 110.1 to implement article XIII A. This section presently reads: "(a) For purposes of subdivision (a) of Section 2 of Article XIII A of the California Constitution, 'full cash value' of real property . . . means the fair market value as deter-

mined pursuant to Section 110 for either:

"(1) The 1975 lien date; or

"(2) For property which is purchased, . . . after the 1975 lien date:

"(A) The date on which a purchase . . . occurs . . . ."

According to section 110, ". . . 'fair market value' . . . means *the amount of cash or its equivalent which property would bring if exposed for sale in an open market* under conditions in which neither buyer nor seller could take advantage of the exigencies of the other and both with knowledge of all of the uses and purposes to which the property is adapted and for which it is capable of being used and of the enforceable restrictions upon those uses and purposes." (Rev. & Tax. Code, § 110, italics added.)

Accordingly, the Legislature, for the purposes of article XIII A, section 2, subdivision (a) has defined "full cash value" of property as the amount of cash or its equivalent, which the property would bring in a fair and open market, measured when the property is purchased. Not surprisingly then, in most cases, this represents the "acquisition cost" of the property. We are of the opinion that the Legislature's definitions are reasonable and comport with the intended meaning of article XIII A.[2] ■ " '[W]here a constitutional provision may well have either of two meanings, it is a fundamental rule of constitutional construction that, if the Legislature has by statute adopted one, its action in this respect is well nigh, if not completely, controlling. . . . and the courts should not and must not annul, as contrary to the constitution, a statute passed by the Legislature, unless it can be said of the statute that it positively and certainly is opposed to the constitution.' " (*Methodist Hosp. of Sacramento* v. *Saylor* (1971) 5 Cal.3d 685, 692 [97 Cal.Rptr. 1, 488 P.2d 161] quoting *San Francisco* v. *Industrial Acc. Com.* (1920) 183 Cal. 273, 279 [191 P. 26]; *Armstrong* v. *County of San Mateo* (1983) 146 Cal.App.3d 597, 623 [194 Cal.Rptr. 294].)

■ It is evident to us that the term "appraised value when purchased" as set forth in section 2, subdivision (a) constitutes a change in the *time* at which property purchased post March 1, 1975, is to be appraised and assigned a value by the assessor. Until the enactment of Proposition 13, all property was appraised as of the lien date every year (Mar. 1), regardless of whether the property had been purchased during that year. With the

---

[2]Section 110.1 of the Revenue and Taxation Code first became effective on June 24, 1978. It was subsequently amended on June 30, 1978, August 31, 1978, May 2, 1979, and September 30, 1979. While there were some slight language changes in previous versions, they were not inconsistent with the present language.

enactment of Proposition 13, however, not all property is appraised annually. After March 1, 1975, only that property which was purchased in each year was reappraised that year and those properties were appraised as of their actual date of sale, or acquisition, instead of a fixed lien date.

We find, therefore, that for properties which were sold after March 1, 1975, and had only lien date values between 1975 and 1979, it was proper for the county assessor to go back and calculate the value of those properties, as of the actual date of purchase. Appellants argue that this procedure constitutes a "re-appraisal" which is not permitted under section 110.1, subdivision (c) of the Revenue and Taxation Code. However, appellants' reliance on this section is misplaced. The provisions of section 110.1, subdivision (c) are applicable only to property acquired before March 1, 1975. What we are dealing with here is property acquired *after* March 1, 1975. Moreover, respondents are not "re-appraising" property purchased between March 1, 1975, and February 28, 1979, but rather are appraising it for the *first time* as of its date of acquisition.

Further, we reject appellants' suggestion that the assessor was somehow bound to find that the "full cash value" at the date of purchase was closely related to the figures on the tax rolls for the lien dates either preceeding or following the sale. It is acknowledged by both parties that a greatly reduced number of yearly assessments was required after the passage of Proposition 13. The parties also agreed that post-Proposition 13, the determination of the value of property which had been sold is based on the actual event, the sale, whereas pre-Proposition 13 the value was based on a hypothetical event, an estimate as to what would have occurred if the property had been sold. Additionally, as the parties stipulated, the values used to estimate a purchase price pre-Proposition 13 were based on information which was between six months and three years old. Necessarily, therefore, an appraisal made by the assessor which uses the purchase price of the *actual* sale of the property as one point of reference, will be more accurate, than an appraisal which is based on hypothetical events and outdated information. We find, then, that the less accurate lien date figures are not limitations on the values determined by the assessor for the actual date of purchase.

In *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208 [149 Cal.Rptr. 239, 583 P.2d 1281], the Supreme Court approved relating the appraised value of property to its acquisition cost. The court stated ". . . henceforth all real property will be assessed and taxed at its value *at date of acquisition* rather than at current value (subject, of course, to the 2 percent maximum annual inflationary increase provided for in subdivision (b)). This 'acquisition value' approach to taxation finds reasonable support in a theory that the annual taxes which a prop-

erty owner must pay should bear some rational relationship to the original cost of the property, rather than relate to an unforseen, perhaps unduly inflated, current value." (At p. 235, italics in original.)

In the instant case "full cash value" of property purchased post-1975, and valued by the assessor as of the date of purchase, also began to reflect the property's actual acquisition cost. In accordance with the Supreme Court's language in *Amador Valley,* we find no fault with a system of assessment practices which establishes the appraised value of property when purchased to be closely related to its acquisition cost.

III. Assuming respondents' method of determining the appraised value of appellants' properties is correct, appellants contend they are nevertheless entitled to relief. It is appellants' position that the appraisal procedures presently employed by respondent county assessor deprives them of equal protection of the laws guaranteed by the United States and California Constitutions.

Respondents argue that appellants are barred from seeking relief on equal protection grounds because they failed to raise that ground in their claim for refund. (Rev. & Tax. Code, § 5142[3]; *American Alliance Ins. Co. v. State Bd. of Equalization* (1982) 134 Cal.App.3d 601, 609 [184 Cal.Rptr. 674].) Appellants, however, argue that since their claim for refund stated that the respondent county assessor was "departing from established concepts of uniformity" this was sufficient specification of the equal protection ground. We would concede that the appellants' statement is not a model of clarity, but do believe it is sufficient to raise the equal protection issue. We therefore consider the merits of this issue in order to reach a final resolution of this dispute.

The equal protection argument is predicated on appellants' claim that they, and other persons who purchased property after March 1, 1975, are being subjected to assessment procedures different than were the class of people who purchased property before that date. From the facts as stipulated, however, appellants cannot establish any denial of equal protection.

Appellants agree with respondents, that both before and after the adoption of article XIII A, the assessor's assessment procedures were and are consistent with the provisions of Revenue and Taxation Code section 110. The parties also agree that the "regression analysis procedure," which is pres-

---

[3]Revenue and Taxation Code section 5142 states, "No action shall be commenced or maintained under this article unless a claim for refund has first been filed . . . . [¶] *No recovery shall be allowed in any such action upon any ground not specified in the claim.*" (Italics added.)

ently being used in reaching the computer calculated value for real property as of the purchase date, is the same as was used before Proposition 13. The only difference in the whole appraisal procedure appears to be, that instead of using a hypothetical figure for the fair market value of the property being appraised, the assessor now has an actual value available, the purchase price of the property, which is then adjusted as required by Revenue and Taxation Code section 110. As we have noted above, this has necessarily led to increased accuracy in determining the "full cash value" at the time of purchase. Moreover, comparable sales data used in the evaluation procedures, are current, rather than outdated.

In most instances property is sold under conditions consistent with section 110 and the actual purchase price is therefore reflective of its true fair market value. This explains why, (as reflected in the agreed statement of facts) in approximately 85 percent of the properties concerned, the purchase price was determined by the assessment procedure to be "full cash value."

Respondent describes the situation succinctly, "[a]ppellants' equal protection argument really boils down to a complaint that in applying the standards of section 110 after Proposition 13, the assessor has *more accurately* determined full cash value than before Proposition 13." We agree. Since Proposition 13 the greatly decreased number of annual assessments (only 19 percent of pre-Proposition 13 volume), and the use of actual rather than hypothetical purchase price values, have contributed to an increased accuracy in the assessor's determination of the "full cash value." This increased accuracy does not amount to a denial of equal protection. By stipulating that the same assessment procedures and the same computer analysis was used by the assessor both before and after Proposition 13, appellants have eliminated any possible factual basis for establishing a denial of equal protection.

We affirm the trial court's judgment of dismissal.

Caldecott, P. J., and Poché, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied June 21, 1984.