FILED
Clerk
District Court

MAY 12 1987

For The Northern Mariana Islands
By:_____
(Deputy Clerk)

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN MARIANA ISLANDS

APPELLATE DIVISION

MARIA T. PANGELINAN, ) DCA NO. 86-9029
 )
 Plaintiff-Appellee, ) CTC CIV. NO. 86-286
 )
 vs. )
 )
COMMONWEALTH OF THE NORTHERN ) OPINION
MARIANA ISLANDS and FIFTH )
NORTHERN MARIANAS COMMONWEALTH )
LEGISLATURE, )
 )
 Defendants-Appellants.)
_____)

Counsel for Appellee: MARYBETH HERALD
 Fitzgerald, Herald & Bergsma
 P. O. Box 909
 Saipan, CM 96950

Counsel for Appellants: RAYMOND L. RILEY
 Chief Legislative Counsel
 Northern Marianas Legislature
 P. O. Box 586
 Saipan, CM 96950

BEFORE: LAURETA, DUENAS, and FITZGERALD*, District Judges

LAURETA, District Judge:

_____

 *The Honorable James M. Fitzgerald, Chief Judge, United States
District Court of Alaska, sitting by designation.

Appellee Maria T. Pangelinan brought suit against the Commonwealth of the Northern Mariana Islands (CNMI) to enjoin the Legislature from expending sums allocated for legislative salaries. The trial court granted Pangelinan's motion for a preliminary injunction after which she moved for summary judgment. Following the hearing on the summary judgment motion, the trial court issued a permanent injunction prohibiting the Legislature from expending sums in excess of the constitutional ceiling on the legislative budget. The CNMI and the Legislature[1] appeal. We affirm for the reasons set forth below.

## FACTS

In July, 1985, the CNMI held its second Constitutional Convention. Pangelinan was one of 24 elected by the voters to participate as a delegate to the Convention. Constitutional Amendment 9 was one of 44 amendments adopted by the delegates which was later approved by the people of the CNMI in a general election and certified by the Board of Elections.

Amendment 9 placed a $2.8 million ceiling on the Legislature for operations and activities. Subsequently, in order to implement this amendment the Legislature enacted a bill

---

[1] The Legislature originally filed an amicus curiae brief in the trial court and later moved to and was allowed to intervene.

appropriating the sum of $2.8 million for activities and operations of the Legislature for fiscal year 1986. This bill, upon approval of the Governor, became P.L. 5-1. The Legislature then passed another bill which "allocated" $540,000 for legislators' salaries for fiscal year 1986. The Governor approved it and it became P.L. 5-9.

Pangelinan filed suit to enjoin the government from expending the sum allocated by P.L. 5-9 for legislators' salaries. She initially sought a temporary restraining order contending that the $2.8 million budget ceiling on operations and activities of the Legislature already included legislators' salaries; that the $540,000 allocated by P.L. 5-9 constituted an excess over and above that authorized for the Legislature by Constitutional Amendment No. 9. The trial court denied Pangelinan's request for a temporary restraining order, but upon motion was granted a preliminary injunction.

Pangelinan moved for summary judgment pursuant to Commonwealth Trial Court Civil Procedure Rule 56. Following the hearing, the trial court determined sua sponte that summary judgment was inappropriate since Pangelinan was seeking injunctive relief and Rule 56 does not encompass injunctive orders. The trial court determined that a permanent injunction was the proper mode of relief. It also determined that a hearing was not necessary. The trial court permanently enjoined the Legislature from spending more than $2.8 million for operations and activities, including legislators' salaries, in any fiscal

year. The CNMI and the Legislature appealed.

There are three issues presented in this appeal:

1. WHETHER PANGELINAN HAD STANDING AS A TAXPAYER TO CHALLENGE LEGISLATIVE SPENDING.

2. WHETHER THE TRIAL COURT CORRECTLY RULED AS A MATTER OF LAW THAT THE CONSTITUTIONAL CEILING ON THE LEGISLATIVE BUDGET INCLUDED LEGISLATORS' SALARIES.

3. WHETHER THE TRIAL COURT ERRED WHEN IT TRANSFORMED THE PRELIMINARY INJUNCTION INTO A PERMANENT INJUNCTION WITHOUT AN EVIDENTIARY HEARING.

## ANALYSIS

### I. Standing

The Commonwealth Trial Court and this Court (in both the trial and appellate divisions) have consistently supported the principle of taxpayer standing in suits to prevent the government from abusing its authority. See, Lizama v. Rios, CV 85-0011, Decision and Order (D.N.M.I. 1986); Manglona v. Camacho, DCA 82-9009, Opinion, (D.N.M.I. 1983)(aff'g CTC 80-177); and Romisher v. MPLC, CTC 83-401, Order (Commonwealth Trial Court 1983).

Still, the Legislature contends that the trial court erred when it found that Pangelinan had standing to enjoin legislative spending. It cites Taisacan v. Camacho, 660 F.2d 411 (9th Cir. 1981), in support of its proposition that absent direct injury a taxpayer cannot sue to enjoin governmental activities. Reliance on Taisacan is misplaced. Taisacan dealt with a

1153

plaintiff seeking standing in a federal court. Plaintiff in _Taisacan_ was a resident of Rota. He challenged in the federal District Court two gubernatorial vetoes of laws aimed in part at disbursing capital improvement funds for the island of Rota. These funds were paid by the United States to the CNMI under the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America (Covenant). The Covenant was approved by Congress and signed by the President. Of the $4 million annual capital improvement payment under the Covenant, $500,000 was reserved for Rota. Taisacan alleged that the Governor's withholding of the Rota allotment involved a federal question. However, Taisacan failed to allege any direct and unique injury. The Ninth Circuit followed the precedent set by federal courts that individuals challenging governmental actions do not have standing to sue absent a showing of a particularized injury. _See, e.g._, _Ex Parte Levitt_, 302 U.S. 633 (1937). Taisacan's suit was dismissed for lack of standing.

 Pangelinan is challenging the expenditure of Commonwealth funds in contravention of a Commonwealth constitutional amendment. _Lizama_, _Manglona_, and _Romisher_ all stand for the proposition that standing is recognized in the Commonwealth in this situation. Further support for this stance can be found in _Reynolds v. Wade_, 249 F.2d 73 (9th Cir. 1957), cited in _Lizama_ and _Manglona_.

In _Reynolds_, a taxpayer brought suit to enjoin Alaskan

1154

officials from unlawfully expending public funds. The district court dismissed the suit. It found that the plaintiff lacked standing because he had not shown the requisite case or controversy. On appeal, the Ninth Circuit discussed the general rule that a federal taxpayer does not have standing to enjoin the expenditure of federal funds. The rule was based on the fact that since (in 1967) a federal taxpayer was only one of 160 million taxpayers his or her interest was too miniscule to rise to the requisite level of personal injury or harm as a result of a given expenditure. However, the court distinguished the situation presented by a federal taxpayer challenging the expenditure of federal funds from that of a territorial taxpayer challenging the expenditure of territorial funds. The court determined that an Alaskan taxpayer, one of 130,000 taxpayers at that time, had a sufficient interest in the expenditure of territorial funds to enjoin their waste. The Ninth Circuit reversed the district court and granted the plaintiff standing.

As this Court pointed out in _Lizama_, this reasoning is even more compelling where there are less than 30,000 people in the entire Commonwealth - far fewer of whom pay taxes.

The Legislature attempts to negate Pangelinan's claim of standing by including an affidavit from the Director of Finance which indicates that the $540,000 allocated for legislators' salaries does not increase individual taxes. This argument completely misses the point. It also reflects the Legislature's attitude towards its role in disbursing public

funds and supports Pangelinan's assertion that the legislators are merely seeking return of their "gold charge cards." Basically, this argument implies that the Legislature can do anything it wants with public funds provided it does not increase taxes. It perceives this as the sine qua non of taxpayer standing. This perception is incorrect. In re Cole's Estate, 102 Wis. 1, 78 N.W. 402 (1899), was cited and relied upon by the trial division of this Court in Lizama. In Cole's Estate, Cole bequeathed certain real property in trust to the town of Watertown, Wisconsin. When the town, in violation of the trust, sold a portion of the property to cover administrative and repair costs a taxpayer sued to recover the property. 78 N.W. at 404. The Wisconsin Supreme Court recognized standing even though no money was lost to the municipality since the property that had been sold had been received as a gift.

Though the Legislature may be correct in its assertion that individual taxes are not increased as a result of this allocation, this fact is not controlling. Money taken from the general fund to pay legislators' salaries in excess of the constitutional mandate cannot be utilized for other constitutionally or statutorily permitted purposes. Ultimately, there is a harm suffered by Pangelinan and others similarly situated.

Pangelinan also asserts that she has standing based on Constitutional Amendment 31. This amendment provides that a taxpayer can bring an action "to enjoin the expenditure of public

1156

funds for other than public purposes or for a breach of fiduciary duty." CNMI Const. Amend. 31. Because this panel has found that Pangelinan has standing based on case precedent, it will not address the constitutional issue.

Pangelinan was one of 24 delegates elected to the Second Constitutional Convention. She asserted standing based on this fact. The trial court agreed with Pangelinan. The appellants cite this as error. The Court also declines to address this issue since there is standing based on case precedent.

II. The Constitutionality of Public Law 5-9

The crux of this case centers on the proper interpretation of Amendment 9. It states:

Section ___. Budget Ceiling. There shall be a ceiling on the budget of the legislature.

a) Appropriations, or obligations and expenditures, for the operations and activities of the legislature may not exceed two million eight hundred thousand dollars in any fiscal year. This ceiling on the legislative budget shall be divided equally between the Senate and the House of Representatives.

b) Obligations and expenditures for the operations and activities of the legislature for the period October 1 through the second Monday in January of a fiscal year in which there is a regular general election, may not exceed seven hundred thousand dollars or the spending authority otherwise available by law, whichever is less. This ceiling shall apply to the various offices and activities in the same proportions as the annual spending authority provided by law.

. . .

The Legislature interpreted the budget ceiling contained in Amendment 9 to exclude legislators' salaries. The trial court interpreted Section (a) of the amendment to include the salaries of the legislators. The Legislature contends that the court erred. It cites authority for the proposition that there is a strong presumption in favor of a Legislature's interpretation of a constitutional provision. See Methodist Hospital of Sacramento v. Saylor, 97 Cal.Rptr. 1, 488 P.2d 161 (1971). Pangelinan counters that this is a rebuttable presumption. She maintains that this is an appropriate case to overcome this presumption.

Methodist Hospital is distinguishable from the facts herein. It dealt with the expansion of legislative authority. Prior to 1968, the California Constitution prohibited the Legislature from creating any debt or liability in excess of $300,000 without a bond issue, passed by the Legislature and approved by a majority of the voters. In the 1968 California general election, the voters amended the Constitution by adding §21.5 to Article XIII of the Constitution. This amendment authorized the Legislature to "insure or guarantee" loans for the construction of public health facilities. The amendment specifically provided that it was an exception to the $300,000 limit on indebtedness. Subsequently, the Legislature passed a series of statutes to implement this amendment. One of these statutes authorized the issuance of debentures to insure the payment of delinquent loans.

Methodist Hospital was unable to obtain state insurance on a loan to finance the construction of its health care facility. The Director of the Department of Public Health declined to consider Methodist Hospital's application because an independent bond counsel had questioned the power of the Legislature to authorize debentures under the statutory scheme. The hospital sued for a writ of mandamus.

The Director argued that the words "insure or guarantee" did not include debentures. The California Supreme Court pointed out initially that the California Constitution is a limitation or restriction on the Legislature. Therefore, when a party challenged an act of the Legislature, the courts looked to see if the Constitution prohibited the act. California courts interpret these restrictions strictly. The court reasoned that a constitutional amendment removing these restrictions and limitations should, in cases of doubt, be construed liberally. The court concluded that since §21.5 removed the prior limitation on the power of the Legislature to incur debt, the interpretation of how to go about incurring the debt would be left to the Legislature. This, the Court concluded, created a presumption in favor of the Legislature's interpretation of the constitutional amendment. Methodist Hospital, 97 Cal.Rptr. at 5.

Amendment 9 to the CNMI Constitution restricted the Legislature's authority. It prohibited the Legislature from spending more than $2.8 million in any fiscal year. This is precisely the obverse of the situation in Methodist Hospital.

1159

Amendment 21.5 expanded the California Legislature's authority to incur debt. The California court reasoned that the expansion of constitutional authority required a liberal interpretation. Likewise, this Court will strictly construe the constitutional restriction of legislative authority.

California case law may be persuasive but is not controlling authority in the CNMI. But even assuming arguendo that Methodist Hospital was controlling in this case, the Legislature must still fail. Any presumption created by law in favor of the legislative interpretation of a constitutional provision is rebuttable at best. This is particularly so here, in light of the fact that P.L. 5-9 is tied directly to the legislators' pocketbooks. As the Legislature conceded in oral argument, (though now it is only arguing that legislators' salaries are not included in operations and activities) nothing would prevent it in the future from proposing a similar restrictive interpretation which, for example, could exclude legislators' expenses and place that in the same category as legislators' salaries.

There are few principles so ingrained in American jurisprudence than that set down by the United States Supreme Court in Marbury v. Madison, 1 Cranch 137, 2 L.Ed. 60 (1803), where it held that the judiciary is the ultimate interpreter of

///
///
///

the Constitution. There is no legislative history[2] regarding the intent of Amendment 9. The trial court was left to interpret the language of this amendment. The general principles which apply to statutory construction are equally applicable in cases of constitutional construction. Johnson v. State Electoral Board, 53 Ill.2d 256, 290 N.E.2d 886, 888 (Ill. 1972). In interpreting the language of a constitutional provision, the Court applies the plain and commonly understood meaning of the words, unless there is evidence that a contrary meaning was intended. Coalition For Political Honesty, et al. v. State Board of Elections, 65 Ill.2d 453, 359 N.E.2d 138, 143 (Ill. 1976). Further, and more important here, when applying the plain meaning of the words used in a constitutional amendment the Court gives effect to the words as they were understood by the electorate which adopted the amendment. Berry v. School District of City of Benton Harbor, 467 F.Supp. 721 (S.D.Mich. 1978), aff'd and remanded, 698 F.2d 813 (6th Cir. 1983), cert. denied, 104 S.Ct. 235, 236 (1983).

The trial court determined that the plain and commonly understood meaning of legislative budget ceilings for "operations

---

[2] Pangelinan introduced Committee Recommendation 24 entitled "Report to the Convention by the Committee on Finance and Other Matters." This report was compiled by a committee which assisted the constitutional convention delegates by performing research and compiling information on the proposed amendments. Though the court admitted it over objection, it ruled that it ascribed little or no significance to the report and that the same ruling would have been made without it.

AO 72
(Rev.8/82)

1161

and activities" included legislators' salaries. In light of the fact that this amendment was a restriction on legislative authority combined with the fact that it was approved by the electorate who were left to define those words for themselves, the trial court's determination is not unreasonable under the circumstances and it shall be affirmed.

III. The Trial Court's Ruling Without a Hearing

The trial court initially granted Pangelinan's motion for a preliminary injunction preventing the CNMI from expending funds in excess of the $2.8 million ceiling on the Legislature. Pangelinan moved for summary judgment. Following the hearing on Pangelinan's motion for summary judgment, the trial court determined sua sponte that a permanent injunction was appropriate. The Legislature objects to the court's procedure and to its ultimate conclusion.

A preliminary injunction can be transposed into a permanent injunction without an evidentiary hearing where there exists no triable issue of fact. See, e.g., United States v. McGee, 714 F.2d 607, 613 (6th Cir. 1983). There were no issues of material fact before the trial court. It did not err when it granted the permanent injunction.

Pangelinan presented to the Court Amendment 9. The amendment stated that the Legislature's budget could not constitutionally exceed $2.8 million in any fiscal year. She also presented to the Court two public laws, P.L. 5-1 and 5-9.

1162

Public Law 5-1 appropriated $2.8 million for operations and activities of the Legislature for fiscal year 1986. Public Law 5-9 allocated $540,000 for legislative salaries for that same year. The Legislature did not challenge the fact that $2.8 million had been appropriated in P.L. 5-1. It did not challenge the fact that an additional $540,000 had been "allocated" in P.L. 5-9. The trial court noted that it had no formal compilation of legislative history to rely upon for its decision. The Legislature argued that the delegates' intent was an issue of fact. The only conceivable way to determine the intent of the given amendments was to ask each delegate what his or her intent was in drafting the proposed amendment. This procedure would have definitely proved to be burdensome and of little help in determining the ultimate issue. The people voted on these amendments. They were left to interpret the plain meaning of the words contained therein. So did the trial court. Its decision is AFFIRMED.

_____
JUDGE ALFRED LAURETA

_____
JUDGE CRISTOBAL C. DUENAS

_____
JUDGE JAMES M. FITZGERALD

1163