CANTIL-SAKAUYE, C. J., Concurring and Dissenting.
I concur in parts H.A., H.B., and HE. of the majority opinion, but respectfully dissent from the remainder of the opinion concerning .the constitutionality of Assembly Bill IX 27.[1] The majority concludes that Assembly Bill IX 27 is unconstitutional because it violates article XBI, section 25.5, subdivision (a)(7)(A) of the California Constitution (added by Prop. 22, approved by voters, Gen. Elec. (Nov. 2, 2010)). I part with the majority on this point because, although it may be possible that Assembly Bill IX 27 may cause some community *277 sponsors[2] to utilize funds otherwise protected by Proposition 22, petitioners have not met their burden of supporting this contention. In fact, they provide documentation that suggests quite the opposite. Moreover, on its face, nothing in Assembly Bill IX 27 compels community sponsors to violate Proposition 22. Ultimately, the majority’s conclusion rests on an impermissibly broad reading of Proposition 22 plain language, on unsupported assumptions concerning the intent behind Proposition 22, and on speculation that constitutional problems could result from the implementation of Assembly Bill IX 27. In doing so, the majority does not apply well-settled rules of statutory and constitutional construction.
I. Facial Challenges and the Rules of Statutory and Constitutional Construction
I first address the applicable rules concerning petitioners’ facial challenge of Assembly Bill IX 27 and the interpretative framework governing challenges to the constitutionality of the statutes enacted by this bill.
A. Facial Challenges versus “As Applied’’ Challenges
Generally, a facial challenge to the constitutionality of legislation “considers only the text of the measure itself, not its application to the particular circumstances of an individual.” (Tobe v. City of Santa Ana (1995) 9 Cal.4th 1069, 1084 [40 Cal.Rptr.2d 402, 892 P.2d 1145].) In contrast, an “as applied” challenge to the constitutionality of legislation involves an otherwise facially valid measure that has been applied in a constitutionally impermissible manner. This type of challenge “contemplates analysis of the facts of a particular case or cases to determine the circumstances in which the [measure] has been applied and to consider whether in those particular circumstances the application deprived the individual to whom it was applied of a protected right.” (Ibid.)
Petitioner California Redevelopment Association concedes that it is making a facial challenge to Assembly Bill IX 27.[3] “A facial challenge to a *278 legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.” (United States v. Salerno (1987) 481 U.S. 739, 745 [95 L.Ed.2d 697, 107 S.Ct. 2095].) The circumstance that an act “might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid” under a facial challenge. (Ibid.)
B. Petitioners’ Burden Under a Facial Challenge
In describing petitioners’ burden, we have sometimes articulated differing standards. Under the strictest standard, “ ‘[t]o support a determination of facial unconstitutionality, voiding the statute as a whole, petitioners cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular application of the statute .... Rather, petitioners must demonstrate that the act’s provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions.’ ” (Arcadia Unified School Dist. v. State Dept. of Education (1992) 2 Cal.4th 251, 267 [5 Cal.Rptr.2d 545, 825 P.2d 438], quoting Pacific Legal Foundation v. Brown (1981) 29 Cal.3d 168, 180-181 [172 Cal.Rptr. 487, 624 P.2d 1215].) Under the more lenient standard, petitioners need only demonstrate that the measure “conflicts with [the Constitution] ‘in the generality or great majority of cases.’ [Citations.]” (Guardianship of Ann S. (2009) 45 Cal.4th 1110, 1126 [90 Cal.Rptr.3d 701, 202 P.3d 1089].)
It is unclear which standard the majority employs, but, as I will explain, I believe petitioners have not met their burden under either standard concerning the alleged unconstitutionality of the statutes enacted by Assembly Bill IX 27.
C. The Applicable Interpretative Rules of Constitutional and Statutory Construction
In assessing the merits of petitioners’ facial challenge, we are governed by a specific interpretative framework that constrains how we must view the interaction between the statutes enacted by Assembly Bill IX 27 and Proposition 22.
As the majority notes, Proposition 22, which added subdivision (a)(7)(A) to section 25.5 of article XIII of the California Constitution, limits what the Legislature may do with respect to redevelopment agency tax increment funds. Respondent Matosantos correctly argues that Proposition 22 imposes a *279 constitutionally based limitation on the powers of the Legislature, and we must construe such limits strictly. (White v. Davis (2003) 30 Cal.4th 528, 539-540 [133 Cal.Rptr.2d 648, 68 P.3d 74]; Pacific Legal Foundation v. Brown, supra, 29 Cal.3d at p. 180.) This strict construction of the constitutional limits on legislative power is required because “ ' “we do not look to the Constitution to determine whether the legislature is authorized to do an act, but only to see if it is prohibited.” [Citation.]’ ” (White v. Davis, supra, at p. 539, quoting Methodist Hosp. of Sacramento v. Saylor (1971) 5 Cal.3d 685, 691 [97 Cal.Rptr. 1, 488 P.2d 161].) Given that legislative power is “ ‘ “practically absolute,” ’ ” any constitutional limitations on this power are strictly construed and may not be given effect as against the general power of the Legislature “ ' “unless such limitations clearly inhibit the act in question.” ’ ” (Amwest Surety Ins. Co. v. Wilson (1995) 11 Cal.4th 1243, 1255 [48 Cal.Rptr.2d 12, 906 P.2d 1112] (Amwest).) Accordingly, in the face of a constitutionally based limitation on its power, “ ' “[i]f there is any doubt as to the Legislature’s power to act in any given case, the doubt should be resolved in favor of the Legislature’s action.” ’ ” (White v. Davis, supra, at p. 539, quoting Methodist Hosp. of Sacramento v. Saylor, supra, at p. 691.)
Furthermore, although “ ‘[t]he judiciary’s traditional role of interpreting ambiguous statutory language or “filling in the gaps” of statutory schemes is ... as applicable to initiative measures as it is to measures adopted by the Legislature,’ ” we have warned that “the initiative power is strongest when courts give effect to the voters’ formally expressed intent, without speculating about how they might have felt concerning subjects on which they were not asked to vote.” (Ross v. RagingWire Telecommunications, Inc. (2008) 42 Cal.4th 920, 930 [70 Cal.Rptr.3d 382, 174 P.3d 200], quoting Evangelatos v. Superior Court (1988) 44 Cal.3d 1188, 1202 [246 Cal.Rptr. 629, 753 P.2d 585].) Therefore, unless “the text is ambiguous and supports multiple interpretations,” our court must rely upon “the text as the first and best indicator of intent.” (Kwikset Corp. v. Superior Court (2011) 51 Cal.4th 310, 321 [120 Cal.Rptr.3d 741, 246 P.3d 877].) Even “a command that a constitutional provision or a statute be liberally construed ‘does not license either enlargement or restriction of its evident meaning’ ” because unambiguous language requires no need for engaging in liberal construction.[4] (Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles (2001) 24 Cal.4th 830, 844 [102 Cal.Rptr.2d 719, 14 P.3d 930], quoting People v. Cruz (1974) 12 Cal.3d 562, 566 [116 Cal.Rptr. 242, 526 P.2d 250].)
As for our interpretation of the statutes enacted by Assembly Bill IX 27, we presume the constitutionality of a legislative act, resolving all doubts in its favor, and we must uphold it unless a “ ‘conflict with a provision of the state *280 or federal Constitution is clear and unquestionable.’ ” (Amwest, supra, 11 Cal.4th at p. 1252.) This presumption is particularly appropriate when, as here, “the statute represents a considered legislative judgment as to the appropriate reach of the constitutional provision.” (Pacific Legal Foundation v. Brown, supra, 29 Cal.3d at p. 180; see Legis. Analyst’s Off., The 2011-12 Budget: Should Cal. End Redevelopment Agencies? (Feb. 9, 2011) p. 12 [warning the Legislature that Prop. 22 and other measures limit “the state’s authority to shift property taxes and/or redirect tax increment revenues” and that “[drafting a plan for local governments to carefully unwind their redevelopment programs and successfully navigate the many legal, administrative, and financial factors will be complex”].)
From these principles, I conclude that our analysis must begin with the presumption that Assembly Bill IX 27 is constitutionally valid unless it conflicts with the state Constitution in a clear and unquestionable manner. Because Proposition 22 restricts the Legislature’s power, it must be strictly construed. But even though Proposition 22 contains a demand that it be liberally construed, as with any statute, we cannot give Proposition 22 an interpretation beyond its formally expressed intent if its language is clear.
II. Interpreting Proposition 22
I conclude that, even assuming the circumstances most favorable to petitioners—applying the more lenient standard for facial challenges and broadly construing Proposition 22—petitioners have failed to sustain their burden to show that Assembly Bill IX 27 is unconstitutional.
A. Proposition 22 and Assembly Bill IX 27 Generally
Proposition 22 prohibits the Legislature from requiring “a community redevelopment agency ... to pay, remit, loan, or otherwise transfer, directly or indirectly, taxes on ad valorem real property and tangible personal property allocated to the agency pursuant to Section 16 of Article XVI [i.e., its tax increment funds].” (Cal. Const., art. XIII, § 25.5, subd. (a)(7)(A).) Given the rules of interpretation described ante, it is important to note what, exactly, this constitutional provision expressly prohibits: the Legislature cannot require a redevelopment agency to directly or indirectly reallocate its tax increment funds.
In contrast, Assembly Bill IX 27 does not require or compel any redevelopment agency to make any payment. It specifically provides that the *281 community sponsor, whether it be a city, county, or other local government entity, “may use any available funds not otherwise obligated for other uses” to make a payment. (Health & Saf. Code, § 34194.1, subd. (a).)[5] The payments required by Assembly Bill IX 27 to establish or continue redevelopment agencies are to be made by community sponsors, not redevelopment agencies. Although Assembly Bill IX 27, through the enactment of section 34194.2, permits a community sponsor to enter into an agreement with its redevelopment agency to use its tax increment revenue to hand the payment, such agreements are not compelled or required by Assembly Bill IX 21.[6] Moreover, nothing in Assembly Bill IX 27 requires that a redevelopment agency’s tax increment be reallocated, either directly or indirectly, to satisfy the payments. Instead, the measure is neutral as to the source of funds for the Assembly Bill IX 27 payments.[7]
*282 B. The Applicable Language of Proposition 22 Does Not Require a Liberal Construction
The majority asserts that California Constitution article XIII, section 25.5, subdivision (a)(7) (as added by Prop. 22) is ambiguous, thereby requiring an examination of its history to ascertain its intended meaning. The majority identifies as ambiguous Proposition 22’s use of the words “indirectly” and “directly,” especially in view of prior statutory shifts involving ERAF’s pursuant to which the Legislature diverted redevelopment agency tax increment revenue to fund schools.
The majority notes that a distinct provision in each of those prior ERAF shifts, going back to 2003, allowed the shift to be funded in a revenue-neutral and source-neutral manner and without necessarily using tax increment funds. For instance, in the legislation enacting the last ERAF shift, which directly led to Proposition 22’s placement on the November 2010 ballot, the Legislature included a statute that did not require the ERAF shift payment to come specifically from tax increment funds, but instead provided that in order “[t]o make the allocation required by this section, an agency may use any funds that are legally available and not legally obligated for other uses, including, but not limited to, reserve funds, proceeds of land sales, proceeds of bonds or other indebtedness, lease revenues, interest, and other earned income.” (§ 33690.5, subd. (b), italics added.) It also included a “catch-all” statute that allowed a local legislative body, in lieu of the redevelopment agency, to make the ERAF payments “from any funds that are legally available for this purpose.” (§ 33692, subd. (c), italics added.) Accordingly, the majority reasons that Proposition 22’s language, prohibiting the direct or indirect transfer of tax increment funds, is specifically intended to stop the kind of payments described by Assembly Bill IX 27.
However, Proposition 22’s plain language simply does not prohibit the kind of payments described by Assembly Bill IX 27.
Proposition 22 prohibits the Legislature from requiring “a community redevelopment agency ... to pay, remit, loan, or otherwise transfer, directly or indirectly,” its tax increment funds. (Cal. Const., art. XIII, § 25.5, subd. (a)(7)(A), italics added.) As previously described, however, the Assembly Bill IX 27 payments must be made by community sponsors, not redevelopment agencies. Nothing in Assembly Bill IX 27 requires a redevelopment agency “to pay, remit, loan, or otherwise transfer, directly or indirectly,” *283 its tax increment funds. If Proposition 22 intended to prohibit the payments described by Assembly Bill IX 27, it could have been written to prohibit the Legislature from requiring a local government body or community sponsor “to pay, remit, loan, or otherwise transfer, directly or indirectly,” its tax increment funds. But it was not drafted that way.
Additionally, nothing in Proposition 22 restricts the Legislature from using tax increment funds as the basis for a particular calculation. Certainly, Assembly Bill IX 27 uses the size of tax increment funds as a “yardstick” or, as the majority characterizes it a “levy,” to determine the size of the described payments, but such use is not prohibited by Proposition 22’s plain language.
Pointedly, the word “levy” appears nowhere in Proposition 22. Instead, the drafters of Proposition 22 listed a very specific catalog of actions, prohibiting the Legislature from requiring a redevelopment agency “to pay, remit, loan, or otherwise transfer” its tax increment funds. (Cal. Const., art. XIII, § 25.5, subd. (a)(7)(A), italics added.) “ ‘ [W]hen a statute contains a list or catalogue of items, a court should determine the meaning of each by reference to the others, giving preference to an interpretation that uniformly treats items similar in nature and scope. [Citations.] In accordance with this principle of construction, a court will adopt a restrictive meaning of a listed item if acceptance of a more expansive meaning would make other items in the list unnecessary or redundant, or would otherwise make the item markedly dissimilar to the other items in the list. [Citations.]’ ” (Commission on Peace Officer Standards & Training v. Superior Court (2007) 42 Cal.4th 278, 294 [64 Cal.Rptr.3d 661, 165 P.3d 462], quoting Moore v. California State Bd. of Accountancy (1992) 2 Cal.4th 999, 1011-1012 [9 Cal.Rptr.2d 358, 831 P.2d 798].) Placing aside the problem that the list of verbs applies only to redevelopment agencies, expansively reading the word “levy” into the list of prohibited actions would conflict with the other words in the list describing actions that “otherwise transfer” tax increment funds, making the remaining words unnecessary or redundant. If Proposition 22 truly intended to prevent the Legislature from using tax increment funds as the basis for calculating certain payments or as the basis of a levy, it could have been written to prohibit the Legislature from requiring “a community redevelopment agency to pay, remit, loan, or otherwise transfer, directly or indirectly,” its tax increment funds “or to levy such revenues or use them as the basis for certain remittances.” But again, it was not drafted that way.
*284 C. A Liberal Construction of Proposition 22 Does Not Render Assembly Bill IX 27 Facially Unconstitutional
Even if Proposition 22’s use of the words “directly” or “indirectly” is ambiguous and raises colorable questions of whether Proposition 22 might apply to community sponsors or whether it might prohibit the use of tax increment funds as a “yardstick” or “levy,” I still cannot agree with the majority’s conclusion that Assembly Bill IX 27 is unconstitutional.
1. A Broad Construction of the Word “Indirectly”
The express obligation to make the payments to establish or continue redevelopment agencies rests on community sponsors, and not on redevelopment agencies themselves and Assembly Bill IX 27 does not expressly compel the use of tax increment funds to make the Assembly Bill IX 27 payments. However, the majority relies on the history of prior ERAF legislation and apparently infers that Proposition 22 intended its use of the word “indirectly” to cover the entire scenario posed by the Assembly Bill IX 27 payments. But a careful dissection of the 2009 ERAF legislation, much of which was the immediate trigger for Proposition 22, illustrates why this reasoning is erroneous.
As relevant here, the 2009 ERAF shift legislation covered two fiscal years and was comprised of four different statutes. (Assem. Bill No. 26 (2009-2010 4th Ex. Sess.) enacted as Stats. 2009, 4th Ex. Sess., ch. 21, §§ 6—9; §§ 33690 [for fiscal year 2009-2010], 33690.5 [for fiscal year 2010-2011], 33691, 33692.)[8] A review of the first three of these statutes reveals that the Legislature clearly targeted redevelopment agencies and their tax increments as the funding source for the ERAF shifts. But the fourth statute, section 33692, was a stand-alone, catch-all provision that, unlike the other three statutes, expressed a revenue-neutral stance as to the money used to fund the ERAF shifts. As I will explain, no liberal construction of Proposition 22 can stretch to prohibit similar revenue-neutral provisions enacted by Assembly Bill IX 27.
The first two statutes specify that a redevelopment agency “shall remit” the ERAF shifts, and that payments were to be based directly on a proportion of *285 the redevelopment agency’s net tax increment. (§§ 33690, subd. (a), 33690.5, subd. (a), italics added.) Both statutes state that the ERAF remittance for each fiscal year is “declared to be an indebtedness of the redevelopment project to which they relate, payable from” tax increment funds. (§§ 33690, subd. (e), 33690.5, subd. (e).) Each statute also states, however, that the redevelopment agency could make the payment by using any of the redevelopment agency’s other available revenue sources. (§§ 33690, subd. (b), 33690.5, subd. (b).) Each further declares, “[i]t is the intent of the Legislature, in enacting this section, that these allocations directly or indirectly assist in the financing or refinancing, in whole or in part, of the community’s redevelopment project pursuant to Section 16 of Article XVI of the California Constitution.” (§§ 33690, subd. (f), 33690.5, subd. (f), italics added.)
Under both the plain language of Proposition 22 and a liberal construction of its use of the word “indirectly,” the Legislature is clearly prohibited from enacting future legislation identical to these first two statutes. Because these first two statutes, sections 33690 and 33690.5, compelled redevelopment agencies to make the ERAF remittances and defined the revenue shifts, whether from tax increment funding or other available revenue, as part of the redevelopment agency’s indebtedness, payable from tax increment funds, the drafters of Proposition 22 responded by including language that would prohibit the Legislature from enacting future legislation requiring “a community redevelopment agency ... to pay, remit, loan, or otherwise transfer, directly or indirectly,” its tax increment funds. (Cal. Const., art. XIII, § 25.5, subd. (a)(7)(A), italics added.)
To the extent that sections 33690 and 33690.5 also provide that the redevelopment agency could make the ERAF remittances by using any of the agency’s other revenue sources not related to tax increment funds, a liberal construction of Proposition 22 also would forbid similar measures in the future. Although a redevelopment agency’s use of otherwise available, non-tax-increment revenue cannot be a compelled direct remittance of its tax increment funds, such use may constitute an indirect remittance of its tax increment funds by imposing an additional, immediate financial obligation on the redevelopment agency’s otherwise fixed budget. Thus, the provisions in these first two statutes allowing the ERAF remittance to be funded by other redevelopment agency revenue would be prohibited by Proposition 22 because such a provision would require “a community redevelopment agency ... to pay, remit, loan, or otherwise transfer, directly or indirectly,” its tax increment funds. (Cal. Const., art. XIII, § 25.5, subd. (a)(7)(A), italics added.)
A third statute from the 2009 ERAF legislation allows a redevelopment agency to make partial ERAF remittances if its existing indebtedness made it *286 impossible for the agency to fund the entire ERAF shift. (§ 33691.) “Existing indebtedness” is defined in this section as a financial obligation incurred by the redevelopment agency that required “the payment of which is to be made in whole or in part, directly or indirectly, out of’ tax increment funds. (§ 33691, subd. (a)(1), italics added.) This section contains a provision allowing the redevelopment agency to obtain a loan from its local government for the ERAF payment, but it also specifies that this loan becomes part of the agency’s indebtedness that “shall be payable from tax revenues apportioned to the agency pursuant to Section 33670 [i.e., tax increment funds], and any other funds received by the agency.” (§ 33691, subd. (d)(2), italics added.)
Again, both the plain language of Proposition 22 and a liberal construction of it would prohibit this kind of statute in the future. The loan anticipated by section 33691 must be directly tied into a redevelopment agency’s tax increment funds, and the loan also is indirectly tied to tax increment funding by virtue of continued reliance on “other funds received by the agency.” (§ 33691, subd. (d)(2).) Pointedly, Proposition 22 mirrors the same “directly or indirectly” language used by section 33691, subdivision (a)(1). A future version of this third statute, therefore, would be prohibited under Proposition 22 because it would require “a community redevelopment agency ... to pay, remit, loan, or otherwise transfer, directly or indirectly,” its tax increment funds. (Cal. Const., art. XIII, § 25.5, subd. (a)(7)(A), italics added.)
Finally, a fourth statute from the 2009 ERAF legislation is markedly different from its sister statutes. This fourth statute contains a catch-all phrase allowing a local “legislative body” to make the ERAF remittances on behalf of the redevelopment agency using “any funds that are legally available for this purpose.” (§ 33692, subd. (c).) The statute’s revenue source is neutral and allows payment with “no strings attached,” in the sense that it contains no provision, unlike section 33691, subdivision (d), that converts the payment into an redevelopment agency debt that is payable, either directly or indirectly, through its tax increment funds. To use the majority’s terminology, this fourth statute acts as a kind of “levy” on tax increment funds that can be paid by a local government body using any available revenue source.
Here, I expose the Achilles’ heel of the majority’s reasoning concerning the unconstitutionality of Assembly Bill IX 27. Proposition 22’s plain language simply says nothing about the “yardstick” or “levy” scenario posed by this fourth statute in section 33692. The language of Proposition 22 constrains the Legislature from requiring “a community redevelopment agency” from making certain allocations of its tax increment, either “directly or indirectly.” (Cal. Const., art. XIII, § 25.5, subd. (a)(7)(A).) Proposition 22 *287 does not address a local “legislative body” nor does it address in any respect the use of otherwise unrelated local revenue to pay a “levy” on tax increment funds.
Even a liberal construction of Proposition 22 yields no different conclusion. The only possible ambiguity in the relevant language concerns the use of the word “indirectly,” but that word is bound to the otherwise precise transitive verbs, “pay,” “remit,” “loan,” and “transfer,” all of which are bound to the subject, “a community redevelopment agency,” and the constitutionally protected object, tax increment funds. Simple rules of grammar, therefore, necessarily limit how liberally we may construe the word “indirectly.” (Civ. Code, § 13; Busching v. Superior Court (1974) 12 Cal.3d 44, 52 [115 Cal.Rptr. 241, 524 P.2d 369] [“ordinary rules of grammar” normally “must be applied unless they lead to an absurd result”].) Therefore, the word “indirectly” in plain language prohibits any compulsion being placed on a redevelopment agency to make certain reallocations (not levies) of its tax increment funds (but not other sources of local revenue).
As petitioner California Redevelopment Association conceded at oral argument, there are several sources of local revenues not protected by either Proposition 1A or Proposition 22, including, among other things, rental income, lease income, interest income, sales of government-owned assets, sales of bonds, investment income, and fines, fees, and penalties. Given that such revenues bear no relation to any financing received by a redevelopment agency, it seems impossible to conclude on a facial challenge, as the majority does, that Assembly Bill IX 27 payments funded by these revenues could ever cause a redevelopment agency to indirectly transfer tax increment funds already allocated to it.
Certainly, as previously described, a liberal construction of the word “indirectly” can be applied to prohibit the first three statutes of the 2009 ERAF legislation because they each contained mandates directed at redevelopment agencies and either directly targeted agencies’ tax increment funds or indirectly targeted their tax increment funds by assigning the ERAF shift as indebtedness payable from the redevelopment agency’s revenue sources. Sections 33690 through 33691 express the premise that the ERAF remittances must come from the redevelopment agency, and, to the extent they do not, the nonpayment becomes part of the redevelopment agency’s debt. In fact, the legislation specifically defines a redevelopment agency’s preexisting debt as redevelopment agency payments that have to be made, directly or indirectly, out of tax increment funds. Further, the 2009 ERAF legislation asserts that the ERAF remittances were intended to directly or indirectly further redevelopment projects within the meaning of article XVI of the Constitution. *288 Accordingly, article XIII, section 25.5, subdivision (a)(7)(A) of the Constitution, as enacted by Proposition 22, is completely responsive to the circumstances contemplated by sections 33690 through 33691 by prohibiting the Legislature from requiring “a community redevelopment agency ... to pay, remit, loan, or otherwise transfer, directly or indirectly, taxes on ad valorem real property and tangible personal property allocated to the agency pursuant to Section 16 of Article XVI [i.e., its tax increment funds].”
But the fourth statute—section 33692—poses an entirely different scenario, one that does not require a redevelopment agency to do anything, let alone require it to reallocate its tax increment funds, either directly or indirectly. It contemplates a situation not addressed by Proposition 22, even under a broad construction of that measure. Nevertheless, simply because section 33692 has an analog in Assembly Bill IX 27 in the form of section 34194.1,[9] the majority hastily concludes that Proposition 22 prohibits similar levies on tax increment funds. The plain language, however, of section 25.5, subdivision (a)(7)(A) of article XIII of the California Constitution, as enacted by Proposition 22, does not support such a conclusion, even when liberally construed.
The majority criticizes my reliance on the grammar and syntax of Proposition 22 and cites our decision in Burris v. Superior Court (2005) 34 Cal.4th 1012 [22 Cal.Rptr.3d 876, 103 P.3d 276] (Burris) for the notion that the normal rules of grammar must yield to the drafters’ intent “ ‘to solve human problems’ ” and that we should approach “ ‘an interpretive problem not as if it were a purely logical game, like a Rubik’s Cube, but as an effort to divine the human intent that underlies the statute.’ ” (Id. at p. 1017, quoting J.E.M. AG Supply, Inc. v. Pioneer Hi-Bred International, Inc. (2001) 534 U.S. 124, 156 [151 L.Ed.2d 508, 122 S.Ct. 593] (dis. opn. of Breyer, J.).) Placing aside the fact that the quote originally came from a dissenting opinion by Justice Breyer that had nothing to do with rules of grammar or syntax,[10] any exception to the rules of grammar or syntax might have some justification if we have been presented with the same scenario we faced in Burris, where the disputed language “could readily refer” to two different circumstances, and the legislative history of the measure supplied no “evi *289 dence the Legislature chose a particular construction in order to implement one rule or the other.” (Burris v. Superior Court, supra, 34 Cal.4th 1012, 1018.) But as I have already explained, the relevant language of Proposition 22 is hardly ambiguous, and, to the extent that it is ambiguous, any ambiguity cannot be stretched to give the meaning the majority now assigns to it.[11]
The only way the majority’s interpretation of Proposition 22 could be reconciled with its conclusion that it renders Assembly Bill IX 27 unconstitutional would be if Proposition 22 had been written with a different subject and a different object, stating that the Legislature shall not: “Require a community redevelopment agency local government body ... to pay, remit, loan, levy or otherwise transfer, directly or indirectly, funds based on taxes on ad valorem real property and tangible personal property allocated to fee its redevelopment agency pursuant to Section 16 of Article XVI to or for the benefit of the State, any agency of the State, or any jurisdiction . . . .” But Proposition 22 was not written that way. If the proponents of Proposition 22 had intended to preclude a future version of section 33692, the fourth statute in the 2009 ERAF legislation and its catch-all allowing a “local legislative body” to make remittances on behalf of the redevelopment agency by using “any funds that are legally available for this purpose,” they had every opportunity to draft such language, but they did not. Therefore, the plain language of Proposition 22 does not cover a section 33692 scenario, in which a city, county, or other local government body makes the payment described by Assembly Bill IX 27, nor can it properly be “liberally construed” as doing so.[12]
*290 2. The History of Proposition 22
In some circumstances involving constitutional amendments, “[t]he literal language of enactments may be disregarded to avoid absurd results and to fulfill the apparent intent of the framers. [Citations.]” (Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization (1978) 22 Cal.3d 208, 245 [149 Cal.Rptr. 239, 583 P.2d 1281].) Proposition 22, however, does not present such circumstances.
Nothing in the history of Proposition 22 suggests that its plain language must bend to some greater intention to shield tax increment funds from being used as a mere yardstick or “levy” for certain ERAF payments or that to hold otherwise would generate an absurd result. Uncodified sections of Proposition 22 refer to protecting against the reallocation of tax increment funds in a manner not more expansive than, and entirely consistent with, the language it enacted in article XIII, section 25.5, subdivision (a)(7)(A) of the state Constitution. (Prop. 22, Gen. Elec. (Nov. 2, 2010) §§ 2, subd. (d)(3) [noting that the Legislature has previously “[t]aken local community redevelopment funds on numerous occasions”], 9 [asserting that the “[t]he Legislature has been illegally circumventing Section 16 of Article XVI in recent years by requiring redevelopment agencies to transfer a portion of those taxes for purposes other than the financing of redevelopment projects” (italics added)].) Nothing in Proposition 22’s history suggests that a broader reading—one that applies to and prohibits other entities’ legislative bodies, or community sponsors, being compelled to make certain ERAF payments or prohibits using tax increment funds as a “levy” or yardstick to measure the size of those payments—is required. Nor is this result absurd because the plain language of section 25.5, subdivision (a)(7)(A) in article XIII of the California Constitution, as enacted by Proposition 22, fully encompasses the clearly stated purpose of Proposition 22—“to prohibit the Legislature from requiring, after the taxes have been allocated to a redevelopment agency, the redevelopment agency to transfer some or all of those taxes to the State, an agency of the State, or a jurisdiction; or to use some or all of those taxes for the benefit of the State, an agency of the State, or a jurisdiction.” (Prop. 22, § 9.) Proposition 22 succeeds in ensuring that a redevelopment agency’s largest source of revenue, the tax increment, cannot be reallocated by the state.
Nor does anything in the history of Proposition 22 suggest that its plain language must be construed to accommodate any hypothesized intention to protect 'all conceivable local government revenues or that to hold otherwise would generate an absurd result. Although uncodified sections of Proposition 22 complain that “state politicians in Sacramento have seized and borrowed billions of dollars in local government and transportation funds” (Prop. 22, § 2, subd. (c)) and broadly state that “[t]he purpose of this measure is to *291 conclusively and completely prohibit state politicians in Sacramento from seizing, diverting, shifting, borrowing, transferring, suspending, or otherwise taking or interfering with revenues that are dedicated to funding services provided by local government or funds dedicated to transportation improvement projects and services” (id., § 2.5), the actual express limits that Proposition 22 imposes on the Legislature are quite discrete.
In addition to its language protecting tax increment funds, Proposition 22 provides that “[t]he Legislature may not reallocate, transfer, borrow, appropriate, restrict the use of, or otherwise use the proceeds of any tax imposed or levied by a local government solely for the local government’s purposes.” (Cal. Const., art. XIII, § 24, subd. (b), as added by Prop. 22, Gen. Elec. (Nov. 2, 2010) § 3.) Thus, Proposition 22 protects local taxes specifically earmarked for local government purposes. It also prohibits the Legislature from borrowing from certain funds related to transportation programs, reduces or eliminates the Legislature’s authority to change the distribution of state fuel taxes and vehicle license fees, and ends the Legislature’s ability to order temporary ERAF loans of local property taxes during state financial hardships. (Prop. 22, §§ 4-7.)
The majority broadly concludes that Proposition 22 was drafted with the intent of ending ERAF shifts similar to those that had occurred before, but this history of Proposition 22 does not allow us to paint with such a broad brush. Although the majority assumes the drafters of Proposition 22 and the voters who endorsed it must have intended to preclude the kinds of ERAF shifts that had taken place since 2003, it is noteworthy that the term “ERAF” appears nowhere in either the voter guide or the text of the measure itself and that it is only vaguely referenced as to redevelopment agencies in the Legislative Analyst’s summary of Proposition 22. (Voter Information Guide, Gen. Elec. (Nov. 2, 2010) Legis. Analyst’s analysis of Prop. 22, p. 33 [“Recently, the state required redevelopment agencies to shift $2 billion of revenues to schools over two years.”].) Nor was there any explanation of how the prior ERAF shifts were both revenue and source neutral. To the extent these materials explicitly refer to state-mandated shifts of local revenues to schools, the materials were precise as to Proposition 22’s intentions—it prevents compelling a redevelopment agency to use its tax increment funds to make future payments to schools and it ends the state’s ability to take loans of local property taxes to make temporary payments to schools in state fiscal emergencies.
Proposition 22’s language and history evince nothing more, yet the majority somehow concludes that the drafters of Proposition 22 fully informed the voters that the measure carried the intent of precluding every previously expressed method of funding the prior ERAF shifts. But what part of *292 Proposition 22, in either its history or codified its language, informed voters that the measure intended to also protect “any funds that are legally available for” funding future ERAF payments? (§ 33692, subd. (c).) By assuming such an intended protection, the majority broadly conflates the circumstances leading to Proposition 22’s placement on the ballot with the clear expressed intent of its drafters as documented in both its history and its codified language.
Given the specificity with which Proposition 22 expressly curtails the Legislature’s ability to seize and/or borrow local government revenue, it is far more reasonable to conclude that Proposition 22 was narrowly intended to protect specific local government revenues and not, expansively, to cover “any funds that are legally available for” funding the Assembly Bill IX 27 payments. (§ 33692, subd. (c).) More important, it would be improper to rely upon uncodified sections of Proposition 22 to support an unspoken intent to preclude the use of any otherwise available local funds to make the payments required by Assembly Bill IX 27. (Burden v. Snowden (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672] [“Where the words of the statute are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history.”].) Indeed, it would be an absurd result if we interpreted Proposition 22 to protect all conceivable local revenues in light of its otherwise clear language discretely isolating specific local revenue sources for protection.
Finally, I note that, in many ways, the payments described by Assembly Bill IX 27 are not inconsistent with Proposition 22’s expressly stated intent to prevent “[s]tate raids of revenues dedicated to funding vital local government services and transportation improvement projects and services.” (Prop. 22, Gen. Elec. (Nov. 2, 2010) § 2, subd. (b).) The statutes governing Assembly Bill IX 27 payments for every fiscal year after 2011-2012 provide that the payments are directed solely toward fire, transit, and school districts within the redevelopment project area. (§§ 34194, subds. (a), (c), 34194.1, subds. (b), (c), 34194.4, subds. (a)-(c).) In particular, the portions of Assembly Bill IX 27 payments used to fund schools in the redevelopment project area are made in addition to any funding provided to those schools by the state, potentially resulting in more funding for schools in financially troubled areas. (§ 34194.1, subds. (b), (c).) Far from being a “raid” of local revenues dedicated to essential government services, it seems apparent the Legislature had in mind the needs of local communities when deciding how to best balance the continued benefits of redevelopment.
*293 D. Petitioners Fail to Show That Assembly Bill IX 27 Conflicts with the Constitution “in the Generality or Great Majority of Cases”
Even assuming the broadest possible construction of Proposition 22 and applying the more lenient standard for facial challenges, petitioners have failed to provide evidence to support a finding that Assembly Bill IX 27 is unconstitutional.
Petitioners provide declarations on behalf of only seven of California’s 482 incorporated cities and only one of its 58 counties. Given such a small sampling, even if they all described identical inevitable conflicts between Assembly Bill IX 27 and the state Constitution, this evidence would fail to establish a constitutional violation “ ‘in the generality or great majority of cases.’ ” (Guardianship of Ann S., supra, 45 Cal.4th 1110, 1126.) This showing is insufficient to establish that Assembly Bill IX 27 payments must come, either directly or indirectly, from redevelopment agencies’ tax increment funds in the generality or great majority of cases.
Moreover, the declarations provided by petitioners actually show quite the opposite. The declaration from the executive director of the California Redevelopment Association explains that the tax increment funds of most redevelopment agencies are tied up with existing debt, and that, as a result, “many redevelopment agencies will be unable to fund the required [Assembly Bill IX 27] payments.” The great majority of the other declarants make similar statements about their respective redevelopment agencies. Only one declarant, Mayor Jean Quan, City of Oakland, unequivocally states that her city “can make the Assembly BilllX 27 payment by utilizing its current property tax increment [funds] and all of its remaining reserves. . . .” If these declarations are accepted as true, then they suggest that neither community sponsors nor most redevelopment agencies will actually be compelled to use their tax increments funds to make the Assembly Bill IX 27 payments and there is no violation of Proposition 22.
Thus, petitioners’ own evidence defeats the very notion that Assembly Bill IX 27 will compel a violation of Proposition 22 in the generality or great majority of cases. Given this lack of evidence, the best we can conclude is that it could be possible that the statutes enacted by Assembly Bill IX 27 might cause some redevelopment agencies to waive their constitutional protections as they relate to tax increment funds. But such speculation on a facial challenge cannot render legislation unconstitutional.
This evidentiary failure is unsurprising given that counsel for petitioner California Redevelopment Association candidly admitted at oral argument that his clients’ worst case scenario would be a world where Assembly Bill *294 IX 26 is found constitutional and Assembly Bill IX 27 is not. Implicit in that admission is the recognition that an overly broad interpretation of Proposition 22’s protections would forever place petitioners’ largest and most critical revenue source, tax increment financing, under lock and key. Given that we agree that, under Assembly Bill IX 26, redevelopment agencies can be dismantled and their previously allocated tax increment revenue can be redistributed, how can they now ever be reconstituted and refinanced unless Assembly Bill IX 26 itself is wholly reversed? The irony of these circumstances concerning Proposition 22 should not be ignored—the very measure that was crafted to protect financing for new redevelopment projects has been broadly interpreted in a manner that effectively ends all financing for new redevelopment projects. This cannot be a necessary result intended by the proponents of Proposition 22 concerning redevelopment.
III. Conclusion
Given the procedural posture of this case, the rules of statutory and constitutional construction, and the nature of petitioners’ burden of proof, I believe we cannot declare Assembly Bill IX 27 unconstitutional in the manner articulated by the majority.
Although the system of redevelopment in this state has been far from perfect, it certainly is worth noting redevelopment projects like the restored Public Market Building in downtown Sacramento, the Bunker Hill project in downtown Los Angeles, Horton Plaza and the Gaslamp Quarter in downtown San Diego, HP Pavilion in San Jose, and Yerba Buena Gardens in downtown San Francisco. When faithfully administered and thoughtfully invested in the interests of the community, a redevelopment agency can successfully create jobs, encourage private investment, build local businesses, reduce crime and improve a community’s public works and infrastructure.
A close reading of Assembly Bill IX 27 indicates that the Legislature sought to preserve these benefits by carefully attempting to craft legislation that did not run afoul of our state Constitution. As noted earlier (see ante, p. 292), it even sought to redress some of the inequity the prior system had created by funneling additional money into schools and fire and transit districts within each redevelopment project area. (§§ 34194, subds. (a), (c), 34194.1, subds. (b), (c), 34194.4, subds. (a)-(c).) In advocating for the constitutionality of Assembly Bill IX 27, the California Teachers Association and the state’s largest school district, Los Angeles Unified School District, both point out that Assembly Bill IX 27 would provide schools with an additional $340 million per year, beginning with every fiscal year following 2011-2012. But today, the Legislature’s attempt to balance the benefits of continued redevelopment with the need to fund vital local government *295 services has apparently failed with little or no alternative to continued redevelopment available.
For the reasons set forth above, I conclude that petitioners fail to establish that Assembly Bill IX 27 is unconstitutional on its face.

 This bill added part 1.9 to division 24 of the Health and Safety Code and enacted 14 statutes, Health and Safety Code sections 34192, 34192.5, 34193, 34193.1 to 34193.3, 34194, 34194.1 to 34194.5, 34195, 34196. For sake of consistency, I will use the same designation used by the majority, Assembly Bill IX 27, in making general references to these statutes.

 Also consistent with the majority’s terminology, I will use the term “community sponsor” to describe the local government body, such as a city or county, that may elect to make payments required by Assembly Bill IX 27 in order to continue redevelopment practices.

 Given the procedural posture of this case—an application to declare the statutes enacted by Assembly Bill No. IX 26 (2011-2012, 1st Ex. Sess.) (Assembly Bill IX 26) and Assembly Bill IX 27 unconstitutional after we have substantially stayed their enforcement—it seems very difficult, if not impossible, for petitioners to perfect an “as applied” challenge by arguing that the measures have been or will be enforced in an unconstitutional manner in any particular case. (Tobe v. City of Santa Ana, supra, 9 Cal.4th at pp. 1092-1093.) In any event, as I will explain in greater detail in part ELD., post, the documentation that petitioner presents does not *278 establish that the enforcement of Assembly Bill IX 27 necessarily will result in a violation of Proposition 22 in any particular case.

 In interpreting Proposition 22, the majority opinion fails to acknowledge this particular rule of interpretation.

 Unless otherwise noted, all further statutory references are to the Health and Safety Code.

 Petitioner County of Santa Clara argues that one of the statutes enacted by Assembly Bill IX 27 is unconstitutional because section 34194.2 allows loans of tax increment funds to finance Assembly Bill IX 27 payments in violation of article XVI, section 16, of the state Constitution, which mandates that tax increment funds be used to finance redevelopment projects. But section 34194.2 cannot be facially unconstitutional because its language is permissive—“a city or county may enter into an agreement with the redevelopment agency” to make such loans of local tax increment funds. (Italics added.) This provision, therefore, does not “inevitably pose a present total and fatal conflict with applicable constitutional prohibitions.” (Pacific Legal Foundation v. Brown, supra, 29 Cal.3d 168, 181.) Moreover, even under the more liberal standard for facial challenges, as I will explain in part Ü.D., petitioners have failed to show that section 34194.2 will generate potential violations of the state Constitution “ ‘in the generality or great majority of cases.’ ” (Guardianship of Ann S., supra, 45 Cal.4th 1110, 1126.)

 For this same reason, Assembly Bill IX 27’s revenue-neutral provision, clarifying that a community sponsor “may use any available funds not otherwise obligated for other uses” to make the Assembly Bill IX 27 payments (Health & Saf. Code, § 34194.1, subd. (a)), also forecloses petitioners’ facial challenge based on other provisions of Proposition 22 and on Proposition 1A (as approved by voters, Gen. Elec. (Nov. 2, 2004)). Proposition 1A amended the state Constitution to limit the Legislature’s ability to reallocate property taxes unless passed by a two-thirds vote, but nothing in Assembly Bill IX 27 requires the payments to come from this source. In addition, the mere fact that section 34194.1, subdivision (b) labels its payments as “property taxes” for a single fiscal year, for the purpose of offsetting the state’s school funding obligations in that year, does not violate Proposition 1A as petitioner County of Santa Clara argues. No provision of Assembly Bill IX 27 alters the existing distribution of local property tax revenue actually collected by counties, and section 34194.1’s terminology is simply an extension of the “accounting device” established by the Educational Revenue Augmentation Funds (ERAF’s). (Los Angeles Unified School Dist. v. County of Los Angeles (2010) 181 Cal.App.4th 414, 426 [104 Cal.Rptr.3d 590].) Similarly, another provision of Proposition 22 amended the state Constitution to ensure that the Legislature could not “reallocate, transfer, borrow, appropriate, restrict the use of, or otherwise use the proceeds of any tax imposed or levied by a local government solely for the local government’s purposes.” (Cal. Const., art. XIII, § 24, subd. (b).) But nothing in Assembly Bill IX 27 redirects the proceeds of an otherwise dedicated local tax toward making the Assembly Bill IX 27 payments.

 Over a year later, the Legislature added a fifth statute, section 33691.5, that allowed indebted redevelopment agencies to enter into a long-term payment plan with the state to eventually pay off any outstanding ERAF remittances for fiscal years 2009-2010 and 2010-2011. (Sen. Bill No. 863 (2009-2010 Reg. Sess.) enacted as Stats. 2010, ch. 722, § 8.) Because this measure was signed into law on October 19, 2010, well after Proposition 22 qualified for placement on the November 2, 2010 election ballot, section 33691.5 could not have affected the intent of the drafters of Proposition 22. Accordingly, it bears no relevance to our analysis of what Proposition 22 intended to prohibit.

 Like section 33692 from the 2009 ERAF legislation, section 34194.1 likewise explains that the Assembly Bill IX 27 payments can be funded from any available city or county “funds not otherwise obligated for other uses.” (§ 34194.1, subd. (a).)

 Instead, Justice Breyer used this language as a reason to take exception to “interpretive canon that disfavors repeal by implication.” (J.E.M. AG Supply, Inc. v. Pioneer Hi-Bred. International, Inc., supra, 534 U.S. 124, 155 (dis. opn. of Breyer, J.).)

 More importantly, even ignoring the measure’s actual language, in part II.C.2., I will explain that the drafters’ express intent behind Proposition 22 does not support the majority’s broad “human intent” interpretation, but instead is entirely consistent with the measure’s plain language. Thus, my reliance on the syntax and grammar of Proposition 22 is but one additional reason, among others, that causes me to depart from the views of my colleagues.

 In a footnote (maj. opn., ante, at p. 268, fn. 20), the majority claims that my interpretation would not prohibit the Legislature from implementing in the future any of the same statutes that were part of the 2009 ERAF legislation as long as it also was accompanied by the fourth statute containing a catch-all option not expressly prohibited by Proposition 22. This contention misconstrues both the precise language of the 2009 ERAF statutes and the nature of facial challenges to an individual statute. As previously described, on their face, the first three statutes of the 2009 ERAF legislation are not “options,” and each contains mandatory language prohibited by Proposition 22. Because these three statutes either require the redevelopment agency to remit its tax increment funds or require loans to be backed by its tax increment funds, then their future iterations would be facially barred under Proposition 22. By itself, any future iterations of the fourth catch-all statute, section 33692, would never pose a problem of facial unconstitutionality as measured against Proposition 22, because it is the only one of the four statutes that truly presents an “option” under its plain language.